### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| | **:** **Civil Action No.:** |
| JOHN DOE | **:** |
| | **:** |
| Plaintiff, | **:** |
| v. | **:** |
| | **:** |
| THE HILL SCHOOL | **:** |
| | **:** |
| Defendants. | **:** |
| | **:** |

### VERIFIED COMPLAINT

Plaintiff John Doe ("Doe"), by his attorneys, files this Verified Complaint ("Complaint")

against Defendant The Hill School ("the School"), and alleges as follows[1]:

### NATURE OF THE ACTION

1.       This case concerns improper disciplinary action taken by The Hill School ("the

School") following a flawed hearing with a pre-ordained outcome against an 11th grade African-

American student during one of the most vulnerable and precarious periods of his young life.

John Doe is a gentle, soft spoken and hardworking teen.  He is a talented athlete and has

achieved a top regional ranking for his specific sport. Although a conscientious and hard-

working student, at the age of 8, Doe was diagnosed with attention deficit hyperactivity disorder

(ADHD) and was never able to tolerate the side effects of the prescribed medications which

made school work a particular challenge.  Nevertheless, Doe has managed his ADHD through

sheer perseverance and discipline, and has been very successful in his academics.  In the fall

---

[1]       Contemporaneously with the filing of this Complaint, Doe is filing a Motion for
Permission to Proceed Under Pseudonym.  As set forth in the Motion, Plaintiff is entitled to
proceed anonymously because of the highly sensitive nature of the disciplinary proceeding
against him that forms the basis for his Complaint, and the fact that the School is fully aware of
his identity and will not be prejudiced in any way.

2019, Doe started his first year of high school at a local private school in his hometown and by all accounts flourished academically and socially. Then, in response to the Covid pandemic, Doe's school instituted a hybrid approach to learning for nearly two years, his anxiety skyrocketed and his confidence dropped, and as a result, his academic performance declined.

2.     Doe's family made the difficult decision to have him repeat his junior year and together they determined the Hill School would be a great fit that would allow Doe to flourish academically, to continue to develop his athletic skills, and to earnestly engage in the college preparation stage of his high school career.  Unfortunately, Doe's time at the Hill School was cut short based on an entirely flawed disciplinary process with a pre-ordained outcome that led to his expulsion.

3.     Following a sham disciplinary proceeding, Doe was summarily expelled for participating in a juvenile prank with a group of older students.  The prank—pouring a Dixie cup of water and protein powder on a sleeping classmate—was a common occurrence at the School.   In multiple other instances, discipline for this act was applied inconsistently and unevenly.  Some students were not disciplined at all, some received detention, while still others were suspended.  Doe and two of the four other students who participated with him in the prank were the only ones to have been expelled.  What separates these students from the many others (at least in the School's post-hoc rationalization of its completely disparate treatment) is that Doe and the two other expelled students had prior disciplinary histories.  Doe was adjudicated and sanctioned by the School for participating in the prank as a student already on probation with a prior disciplinary history, which, according to the School, justified the harsh penalty of expulsion.  But Doe should not have had any prior discipline.  That is because the prior discipline imposed against Doe violated the School's substance abuse policies, and specifically

a safe harbor provision within its Student Handbook that allows students suffering from addiction to enroll in the School's rehabilitation program without fear of discipline or reprisal for conduct that led to the student's rehabilitation enrollment in the first place.

4.      On December 12, 2022, roughly two months before participating in the watering prank, one of Doe's classmates reported to the School that Doe had developed a significant substance abuse problem using THC and Nicotine vapes.  Because this was reported to the School by a fellow student, Doe was entitled under the Student Handbook to enroll in the School's non-disciplinary Immediate Care ("I Care") Program.  Doe signed a contract agreeing to enroll in the I Care Program, faithfully complied with all of its requirements, and was experiencing major improvements in all aspects of his life.

5.      At the time of his enrollment, Doe complied with the requirement that he allow the School to search his room and phone.  Doe turned over all of the substances he possessed and truthfully answered the School's questions about his usage and identified individuals that used with him.  As part of the enrollment process the School also made Doe unlock his cell phone so that School administrators could review his text messages in Doe's presence, and then copied and preserved them.  After copying these texts, the school deleted the texts from Doe's cell phone so that only the administrators would have access to them.  The School obtained all of this information through Doe's cooperation and as part of Doe's enrollment in what was promised to be a "non-disciplinary process."

6.      Inexplicably, however, on January 10, 2023, a full month after Doe began his treatment within that program, the School back pedaled on its promise of amnesty.  The School suddenly sprang upon Doe that he would be sanctioned for the information it learned about Doe's prior substance-related behavior when it searched his phone as part of his initial intake

and enrollment a month earlier on December 12, 2022, despite the School's promise that the I

Care program is non-disciplinary.  The School made this pronouncement while Doe was under

the care of the School's treatment program and with knowledge of his fragile state and delicate

recovery prospects.  The School callously imposed a retroactive suspension against Doe for

"time served" (*i.e.,* the week-long period he spent away from the school with family to focus on

his recovery from substance use) and placed him on strict probation.  This invalid retroactive

discipline was applied based on information the school had in its possession for a month—the

same information Doe dutifully confessed within hours of his being reported for substance

abuse on December 12 in reliance on the amnesty offered by the I Care program.  Something

changed in the interim and the School determined it would be to its advantage to pad Doe's

disciplinary record for future punishment purposes.[2]

7.      As a result of this bait-and-switch routine, when Doe went before the School's

Discipline Committee for the prank (an infraction for which many students have received only

detention, if any discipline at all), his prior substance-related issues and wrongful probationary

status were improperly disclosed to the Committee.  The Committee then improperly relied

heavily upon that information to reach a conclusion that Doe was too problematic to remain a

student at the School.  The Chair of the Committee (the same administrator who retroactively

punished Doe for his substance use) authored a decision letter explaining Doe's expulsion that

unambiguously and unabashedly relied upon Doe's substance abuse history to justify his

expulsion in violation not only of his contractual rights with the School, but his civil rights

---

[2]      Doe believes that the School's conduct in disciplining him in connection with his I Care
enrollment and the subsequent discipline he received for the prank may have been racially
motivated.  Doe intends to explore in discovery whether the School's disciplinary history with
regard to drug-related and other disciplinary conduct reflects racial disparities.

under the Americans with Disabilities Act.

8.      As a result of his expulsion, Doe has lost not only the academic environment in which he was beginning to thrive, but also access to a critical rehabilitation program and support structure upon which Doe depends for his recovery. Since his expulsion, Doe has been forced to continue his academics in isolation and is no longer able to engage in any social interactions with his peers, pursue athletics, or engage in the same college preparatory activities necessary for students at this stage of their high school career.  In effect, he is living the Covid pandemic all over again and is already experiencing its devastating mental impact.  This will cause a significant break in Doe's high school academic record and places his ability to be recruited in his sport in serious jeopardy.

9.      Doe is by all accounts a bright and promising young student athlete who, like most young people, has made some mistakes.  While Doe is prepared to answer for those mistakes, he brings this action to ensure that he is treated fairly and consistent with other similarly situated students at the School who were disciplined far less harshly.  He asks this Court to reverse the harsh sanction of expulsion and to require the School to impose the same level of discipline received by other students who engaged in the same prank and who did not have a disciplinary history — the status Doe would and should have been in had the School not violated his rights.  Typically, a suspension lasts for as a short as a few days to a maximum of 10 days.  While Doe's family has attempted to negotiate with the school, Doe already has served the equivalent of a 15-day suspension away from the school.

## THE PARTIES AND JURISDICTION

10.      Plaintiff John Doe is an 18-year-old African American male high school student. At all times relevant to this Complaint, Doe has been a natural person, citizen of the United

States, and resident of the state of New Jersey.

11.     Defendant The Hill School is a nonprofit corporation that is incorporated under the laws of the Commonwealth of Pennsylvania with a principal place of business at 717 East High Street, Pottstown, Pennsylvania 19464-5791.

12.     This Court has federal question and diversity jurisdiction pursuant to 28 U.S.C. § 1331 and § 1332, because (i) the federal law claim arises under a statute of the United States, and (ii) Doe and the Defendants are citizens of different states and the amount in controversy exceeds $75,000.

13.     This Court has personal jurisdiction over the School, because it conducts business within the Commonwealth of Pennsylvania.

14.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391, because the School is located in this judicial district, and all of the events or omissions giving rise to the claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

15.     Doe enrolled in the School as a boarding student in fall 2022 and entered as a Junior, despite his having completed three years of high school elsewhere.  Doe elected to repeat his junior year based upon the lack of educational progress he had made during Covid through the remote learning process.

16.     Doe is a talented student and accomplished student-athlete who had no disciplinary history at his prior school.  He is an athlete who thus far has excelled in his chosen sport, and, even as a junior, he was entertaining calls of interest from colleges interested in having him join their squads upon graduation.  Notwithstanding his academic promise and athletic achievements, Doe suffers from both ADHD and major depressive disorder, and he did

not feel that his prior educational setting provided adequate support to meet his educational needs.  As a student challenged by ADHD, virtual learning during the pandemic was particularly difficult for Doe.  Doe and his parents together decided to transfer Doe to a new high school—and specifically, The Hill School—because of the greater resources the School could provide and the more individualized attention he would receive there.

17.     Doe had some initial difficulties adjusting to the School, which included living away from home as a boarding student for the first time in his life.

18.     Unfortunately, during this time Doe used marijuana and tobacco products as a means of managing his depression and anxiety as well as a way of fitting in with his peers.  The usage of vaporizers with THC infused oil cartridges was extremely prevalent on campus and particularly in the dormitories where the boarding students lived.

19.     Doe's substance use had significant adverse impacts upon both his mental health and emotional well-being as well as his academic performance.

**The Hill School Immediate Care Program**

20.     The School established a program to assist students struggling with substance abuse, which was intended to provide an avenue for students to seek help from the School without fear of discipline.  The program is formally called the "Immediate Care Program," but referred to by the School as "I Care."  The I Care program is described more fully in the Student Handbook.  A true and correct copy of the Student Handbook is attached hereto as Exhibit A (*see* pp. 94-96).

21.     According to the Student Handbook: "[t]he program allows students to get help for themselves or other students without a traditional disciplinary response if the procedures below are followed" and provides an "initial wellness and safety-based alternative to the

deterrence of Hill's disciplinary system . . .." (Ex. A at 94-95).

22.     The I Care program promises that students will not be disciplined for their substance abuse or their participation in I Care if they comply with the strictures of the program, which include an initial assessment (including allowing the School to search the student's room and access the students' phone), a promise of non-use going forward by the student, an agreement to submit to random substance testing, and participation in ongoing one-on-one and group counseling provided by School counselors.

23.     When Doe's substance abuse was first discovered on or about December 9, his condition was severe enough that he was sent home for the final week of the Fall Term (Dec. 12-16, 2022) to begin his recovery with his family.

24.     But before Doe was sent home, and as part of the I Care enrollment process, Doe was brought to an administrator's office to be questioned about his usage and was required to identify other students at the school who also were using.  As part of the I Care enrollment process, and as a condition of his participation in the I Care program, Doe was required to sign a separate I Care contract that set forth his obligations to comply with the requirements of the program.  The School did not provide Doe with a copy of the agreement that he had signed, but, upon information and belief, the I Care contract contains similar representations as those contained in the Student Handbook and provides, in relevant part, that Doe's participation in I Care was not disciplinary and that if he complied with the terms of the I Care program, then his prior conduct related to substance use would not subject him to disciplinary consequences.

25.     As part of the intake and enrollment process, the administrators, who included the Assistant Head of School, Ari Baum, also ordered Doe to turn over his cell phone and provide his password, and Doe complied.  Mr. Baum went through Doe's phone and focused on

a series of text messages Doe had exchanged with a friend concerning their drug use and ordered Doe to take screen shots of the texts in which Baum was interested. Mr. Baum then directed Doe to send those screen shots to Baum and, curiously, delete the originals from his phone. Doe believes this highly unusual conduct by Baum was done to maintain leverage over the students, by allowing the school to maintain exclusive access to information the School deemed incriminating. Notably, these texts were obtained by the School through the mandatory cooperation required of its "non-disciplinary" I-Care enrollment process.

26. The texts taken by the School (which Doe no longer has because he was forced to delete them) reflected that Doe and other students had attempted to avoid detection of their substance use by purchasing detoxifying drinks on Amazon that purportedly would allow a consumer to avoid testing positive for marijuana, and that Doe had brought one of the drinks to a friend who had been asked to submit to a drug test.

27. Also, on or about December 9, 2022, in addition to taking possession of Doe's text messages, the School also conducted a search of Doe's room. Doe fully cooperated with the search of his room and turned over what he had. Through this search, the School obtained information that the School alleged demonstrated that Doe had been involved in the "distribution" of substances on campus.

28. In reality, Doe and his peer group were simply assisting one another in obtaining THC cartridges, sharing what they had, and reimbursing each other when someone was able to purchase cartridges for themselves and their friends—Doe was not involved in the sale of substances at the School.

29. Upon information and belief, the School took advantage of the I Care Program requirement that students permit searches of their personal items and spaces in an attempt to

gather information about broader drug use on campus, which had become a widespread problem among its student population.  For example, the School admitted roughly fifty (50) students into I Care at the time Doe was admitted.  The School conducted these searches under the guise of its amnesty program with the intent of punishing those it believed to be contributing to the problem.

30.     Doe returned home with his parents and remained out of school for the week of December 12 to focus on his recovery.  Winter recess immediately followed from December 16, 2022, through January 3, 2023, during which time Doe stayed with family.  On January 4, 2023, Doe returned to school for the start of the Winter Term and began treatment with the I Care program.

31.     On January 10, 2023, a week after Doe returned from Winter recess, and a *full month after* the School discovered Doe's substance use and related conduct involving the use of detox drinks, Ari Baum, the Assistant Head of School, wrote to Doe's parents to provide them with an "update" on Doe's "status at The Hill School, both in terms of health and wellness, as well as discipline."  In that communication, despite referencing the "non-disciplinary" nature of the I Care program repeatedly, Baum explained the School was nevertheless imposing retroactive discipline against Doe based upon the information uncovered through the I Care Program enrollment process.

32.     Mr. Baum explained that Doe would be retroactively suspended for the time he was away from school (December 12-16) and that he was being placed on "Conduct Warning," which the School defines as a probationary period during which the student is on notice that future disciplinary infractions will result in an increased chance of dismissal from the School.

33.     Mr. Baum's letter stated that "[e]ven though I Care is not disciplinary, these

actions [referring to efforts by Doe and others to drink a cleansing tonic to avoid drug detection] took place prior to his referral to and placement in I Care, therefore making it appropriate that he be formally disciplined." This logically dubious assertion ignores that any conduct that precipitates a student's referral to I Care necessarily predates enrollment in the program. To claim that conduct preceding enrollment in I Care still may be disciplined eviscerates the promise of the program as a safe harbor for students who report their own or their fellow students' substance abuse. Mr. Baum's comments also ignored that Doe's behavior was influenced by his substance abuse for which he sought treatment in the I Care program.

34.     Despite the improper imposition of discipline against Doe through his participation in I Care, Doe and his parents did not at that time challenge the sanction, given that the suspension was limited to "time served" for the time he was already out of school. Moreover, Doe and his parents both recognized that the opportunity to participate in the School's I Care Program, where Doe would receive much-needed counseling and guidance from a licensed therapist while remaining a member of the School community, was of paramount importance.

35.     Doe and his parents were understandably focused on Doe's health and well-being and were not attuned to the potential consequences that the School's improper imposition of a "Conduct Warning" against Doe could have, particularly given the repeated (but false) assurances by the School that Doe's participation in I Care was "non-disciplinary."

36.     Thankfully, Doe thrived under the I Care program. He complied with all the requirements of the program, including demonstrating his non-use through frequent and random drug tests. But beyond complying with the I Care program requirements, he also experienced marked improvement in his mental health and academic performance. Doe's teachers noticed

11

that he was more engaged in class and performing at a higher level (reflected in his much-

improved grades during Winter Term). Similarly, Doe's friends found him to be more present,

cheerful, and outgoing. And Doe's parents most of all noticed that their at-risk son seemed to

be happier and well on his way to recovery and a brighter future.

**Doe is Caught Participating in a Dormitory Prank and Expelled**

37.      Unsurprisingly for a boarding school, there exists a prevalent culture and history

of pranking at the School. Students routinely play jokes and pull pranks on one another in the

dormitories. For seniors, the Student Handbook explicitly condones certain types of pranks—

noting that "Sixth form [senior] pranks are a hallowed tradition and acceptable if they are

carried out in a positive manner." (Ex. A at 14).

38.      Since the School does not allow students to lock their dorm room doors, there is

little impediment to students playing practical jokes on one another. The pranking is

particularly prevalent during weekend nights, when some students may be staying up later to

socialize (or have invited students from other dorms to stay over), while others are sleeping in

their unlocked dormitory rooms.

39.      In early February 2023, Doe was on the receiving end of a particular form of

prank the students referred to as "watering," where students would sneak into the room of a

sleeping classmate and pour water on him in his bed. Watering had been taking place regularly

since the beginning of the school year in general, but with great frequency in Doe's dormitory.

Doe accepted the prank for what it was: annoying in the moment, but goofy adolescent fun not

intended to harm anyone. As such, he did not report his experience to the School.

40.      However, these types of pranks apparently were widespread and had gone on

with enough frequency that the Dorm Parents assigned to Doe's dormitory called for a dorm-

wide meeting on or about February 7, 2023, where they instructed the students to stop. However, the Dorm Parents did not provide any indication of the type of punishment a student might receive for engaging in the pranking behavior.

41.     At the time of the dorm meeting, Doe was aware that several students who were caught engaging in "watering" pranks during the prior academic term had received only detention as a sanction, if any sanction at all.  While Doe understood students were not supposed to prank one another, he was one of the few students in the dorm who had not pranked anyone else and had no appreciation that engaging in pranks could result in expulsion, as he had never heard of its happening.

42.     The following weekend, February 11-12, Doe was up late on a Saturday night/ Sunday morning attempting to remain alert for anyone who might try to prank him again.  Doe heard several students conversing and moving about.  Anxious, Doe left his room to see what was happening.

43.     Doe went into the room across the hall where he heard a commotion and encountered roughly ten students who were discussing pranking another student that night. Among the group were four senior students—two seniors and two postgrads[3]—who decided that they were going to water another student that night.  The four students were spending the night together in one room having been granted permission from their Dorm Parents to do a sleepover.  The upperclassmen encouraged Doe to take part.  As a new student and a junior still finding his niche, Doe felt strong social pressure from these upperclassmen to participate in the

---

[3]     Post-grads are graduated students who elect to remain at the School for an additional year before college in order to focus on further academic or athletic development.  Post grads continue to live in the school dormitory buildings among the current students, but are given more liberties and are subject to fewer restrictions.

prank.

44.     Not surprisingly, the group designated the newest and youngest student by year, Doe, to pour the water, while the others either stood watch or recorded the prank with their cell phones.  One of the upperclassmen retrieved a cup of protein powder from his room and handed it to Doe and told him to pour the powder along with a Dixie cup of water on the sleeping student.  Doe followed through and the group quickly fled.

45.     From Doe's perspective, the group had randomly selected the student to prank. But, unbeknownst to Doe, the student (whom Doe knew and considered a friend) had experienced bullying from others in the dorm, including from some in the group of four who were staying together, and recently had complained to the School.  The Dorm Parents apparently had called a meeting for the students living on the same floor as the targeted student to warn them to leave this student alone.  Because Doe did not live on that floor, he did not receive that warning and was unaware of the targeted student's unfortunate history.

46.     The morning after Doe participated in the "watering" prank, the Dorm Parents called a meeting of the entire dormitory (roughly 50 students) in the common area on the first floor.  The Dorm Parents instructed the group that they would give the perpetrators of the prank just a few minutes to step forward, threatening that any students who did not identify themselves would be severely disciplined.

47.     Doe was frightened and confused by the instruction and the seemingly incongruent threat of a severe penalty for what he viewed as a harmless prank.  As such, he did not step forward, and neither did the other four students.  However, the targeted student had already identified the five students involved to the Dorm Parents.  When the time to self-identify expired, the five students, including Doe, were told to remain while the rest of the

residents were excused.

48.     The students were then separated and made to write statements of what occurred. After Doe completed his statement (in which he truthfully confessed his role in the prank), he was shocked to be advised that he was immediately suspended and that he should wait for his parents to pick him up and take him home.

**The Sham Disciplinary Process and Sanction—The School Wrongfully Exploits Doe's Substance Use History to Justify his Expulsion**

49.     The School advised Doe that it had elected to address his conduct violation through its disciplinary hearing process, which was overseen by the School's Assistant Head of School, Ari Baum.  Although watering was common at the School, no other students who have engaged in the same prank, before or since, have been subject to a formal disciplinary hearing.

50.     On information and belief, it has since become apparent that the School had predetermined that Doe would be expelled, and it elected to proceed with a Discipline Committee proceeding (where the School had not done so in connection with other watering incidents—before or since) to create the illusion that Doe was being given a fair process prior to his expulsion.  In other words, the Discipline Committee hearing was a sham.

51.     Mr. Baum served as the Chair of the Discipline Committee that handled Doe's case and recommended his required withdrawal from the school.

52.     The Student Handbook describes the disciplinary hearing process as follows:

The Discipline Committee convenes to hear cases involving the violation of major school rules, including recurring failure to adhere to lesser school rules. It also serves as an advisory group to the Deans' Office. During the discipline process, parents are to remain off campus so that the student involved may focus on their responsibilities with the Discipline Committee. A student who is brought before the Discipline Committee may choose a faculty member and another Hill student to serve as formal supporters before, during, and after the hearing. Following a question-and-answer period to clarify the student's disciplinary case and history, the student and their supporters can then speak to the character of the student under review. After the statements have been heard, if there

are no further questions, the student and their supporters will be excused from the meeting to allow the Committee to deliberate. During this deliberation, the Committee will consider the student's entire Hill School record. The Committee will then vote on a recommendation to the Head of School on appropriate next steps for the student and community, including whether the student should be required to withdraw from The Hill School. When the final decision is made by the Head of School, it first will be communicated to the student and then to the student's parents. The Dean of Students and/or the Head of School will share the appropriate details of each case with faculty and students

(Ex. A, p. 59).

53.     While Doe was home on interim suspension following the watering to await his disciplinary hearing, he had two meetings with Baum via Zoom to discuss the Discipline Committee process.

54.     During these preparatory meetings, Doe asked whether his participation in I Care and the circumstances that led to his enrollment in the program were relevant and whether he should address that topic in his own statements to the Discipline Committee at his hearing.  Mr. Baum instructed Doe that I Care was not relevant to the proceedings and that he should limit his discussion of what led to his placement on Conduct Warning to simply stating that he had been "dishonest."  Doe relied upon Baum's advice.

55.     Doe was permitted to select a faculty advisor to assist him with the disciplinary process.  Doe's advisor participated in both meetings with Baum, but said nothing.  Doe's parents were not permitted to participate in the Zoom meetings with Baum.

56.     Doe's parents had several meetings with Doe's I Care counselor, Lisa Roethling (a Hill School employee), in connection with the hearing.  Doe's parents were deeply concerned that any separation from the School also would separate Doe from the I Care program and the counseling services upon which Doe depended for his recovery and continued wellbeing.

57.     Ms. Roethling shared this concern and later told Doe's parents that she had

16

attempted to advocate on Doe's behalf at the Discipline Committee hearing.  Specifically, she wanted to provide the context of the important recovery progress Doe had made in I Care and the criticality of the first 12 weeks of the program and that Doe was only six weeks into the program, but she advised Doe's parents that Baum would not permit her to do so.

58.     Doe's hearing took place on February 16, 2023.  During the hearing, Baum, acting as the non-voting chair and moderator, took an active role in the process.  Despite his instruction to Doe not to discuss his prior Conduct Warning in any detail, Baum took it upon himself to advise the Discipline Committee that Doe had received a conduct warning for "interfering with a medical investigation"—referring to Doe's and his friends' consumption of a "detox" drink to avoid testing positive for marijuana use, which took Doe by surprise given Baum's prior instructions not to discuss the events around his enrollment in I Care.

59.     Mr. Baum also prepared a factual statement that he read to the Discipline Committee at the start of the hearing, ostensibly providing what Baum characterized as the relevant undisputed facts for consideration.  As part of the statement, Baum made improper references to the events the led to Doe's enrollment in the non-disciplinary I Care program—an enrollment process that Baum conducted and oversaw.  Mr. Baum's factual recitation noted that "[p]rior to the events of February 12, [Doe] had significant challenges with his conduct *and the disciplinary system*.  In December, he deliberately acted in ways that deeply undermined The Hill School and its medical and investigative processes.  More specifically, [Doe] went out of his way to interfere with a major School investigation.  For these dishonest actions, [Doe] was retroactively suspended from December 12-16 and placed on Conduct Warning for the remainder of his time at The Hill School.  [...] his pattern of behavior is very troubling, including especially the proximity between his prior placement on Conduct Warning and these

most recent infractions."

60.     These statements were gross exaggerations of Doe's substance use and related conduct that led Doe to be enrolled in the I Care program and subsequently (improperly) disciplined.

61.     Doe himself made thoughtful opening and closing statements to the Discipline Committee where he truthfully acknowledged his role in the pranking, expressed remorse for any harm that he caused to the student who had been "watered," and followed Baum's instruction to the letter that he reference being on conduct warning for being "untruthful" in the past, while avoiding detailed mention of his participation in I Care.

62.     Upon information and belief, Baum made further improper disclosures to the Discipline Committee about Doe's substance abuse during deliberations in an attempt to influence the Committee's vote against Doe.

63.     The Discipline Committee voted unanimously to find Doe "responsible" for "Bullying" and "Disrespectful Behavior" and recommended to the Interim Head of School, Dr. Sylvia Rodriguez Vargas, that Doe be required to withdraw from the School.

64.     On February 17, 2022, Baum sent a letter to Doe's parents outlining the result of Doe's disciplinary hearing and explaining the basis for the School's decision to require Doe to permanently withdraw.  The decision letter made clear—in plain and explicit terms—that Doe's substance abuse was a motivating factor in the School's decision.

65.     The letter explained the School's rationale for the severity of the sanction as follows:

> [Doe's] placement on Conduct Warning was outlined in detail in a January 10 email that I sent to your family.  I also met with [Doe] around this time to express with candor how precarious his position at The Hill School would be if he were involved in any future school violations.  It should also be noted that the January 10 email summary also

included detail around [Doe] being placed on I Care in December.  *Even though I Care is non-disciplinary, what we learned during that process is that the extensiveness of his substance possession, usage, and distribution on campus over several months demonstrated extraordinary risk taking. … the totality of his decision making caused his position to be untenable, especially the proximity between his suspension and placement on Conduct Warning, and these most recent infractions.* (emphasis added).

66.     Doe's parents immediately objected to the School's use against their son of information received because of his participation in I Care. They made repeated attempts to meet with School officials to voice their concern that not only was Doe being improperly disciplined, but also was losing access to a critical support program that had been instrumental in his recovery and physical and emotional health.

67.     Doe's parents submitted a letter from Doe's private therapist disclosing to the School how precarious his health situation was, the significant negative impacts the events already had on Doe, and the heightened risk to Doe of relapse without access to the treatment previously provided to him by the School.

68.     Doe's parents also made multiple requests for a face-to-face meeting with the Interim Head of School, Dr. Vargas, who had final decision-making authority for the matter. But for a brief phone call immediately after the decision was issued in which no information was provided, all of Doe's parents' requests were rejected.  Despite the School's stated commitment to the values of "honesty and genuineness, courtesy and respect, and gratitude and concern for the greater good," not one administrator was willing to meet with Doe's parents to hear and address their concerns.

69.     Upon information and belief, given Dr. Vargas' limited time in her role as Interim Head and her lack of disciplinary experience, Dr. Vargas deferred to Baum, who controlled the disciplinary process from start to finish.  Dr. Vargas had no visible role in the process other than to rubber stamp the decision that Baum guided the Discipline Committee to

make.

70.     Doe since has learned that, of the four other students who participated in the

prank, the two seniors who had prior disciplinary infractions were required to withdraw, while

the two post-grads who were without disciplinary history were suspended for no more than 10

days.  As such, it is clear that prior disciplinary history was the deciding factor in whether the

School imposed withdrawal on the students involved in this incident.

71.     Doe also has that at least three more students were caught "watering" in the

weeks after Doe's incident, and that none of those students were required to withdraw, nor did

they have a disciplinary hearing.  As such, Doe asserts that he has been singled out for disparate

treatment based upon his history of substance abuse and the School's improper imposition of a

sanction against him in the context of the non-disciplinary I Care program.

<u>**COUNT I**</u>
**Violation of Title III the Americans with Disabilities Act of 1990 42 U.S.C. § 12181, et seq.**

72.     Doe repeats and re-avers each and every paragraph above, as if fully set forth

herein.

73.     As a private school that provides public accommodation, the School is obligated

to adhere to Title III of the ADA, which prohibits discrimination against individuals "on the

basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges,

advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a).

74.     The School violated the Americans with Disabilities Act by subjecting Doe to

discrimination on the basis of a disability.

75.     Doe is a disabled person within the meaning of the Americans with Disabilities

Act (ADA).  Doe's history of substance abuse is specifically recognized as a disability under

the ADA, because he is "participating in a supervised rehabilitation program and is no longer

engaging in such use." 42 U.S.C. § 12114(b). Doe's past substance abuse substantially interfered with and limited a major life ability—his ability to attend high school, as reflected in his required separation from the School in December 2022.

76.     Doe was otherwise qualified to fully participate as a student at the School and was doing so successfully as a participant in the rehabilitation program furnished by the School.

77.     The School's decision to require Doe to withdraw from school was motivated by its knowledge of Doe's past substance abuse and participation in the I Care program, as demonstrated by the fact that other students engaging in the same conduct, but who were without similar prior disciplinary histories, were not required to withdraw from the School.

78.     Doe has suffered significant damages as a result of the School's adverse decision as he has been expelled from school as a junior, perhaps the most significant year of his academic career for college admissions. Doe is also a talented varsity athlete who is now unable to practice or compete with a team this Spring, the season of his varsity sport. Doe was about to start his junior year season, the most important given that he would like to play in college, and he had been contacted by a number of college coaches. Without the requested relief, he will lose valuable opportunities to demonstrate his skills in a team setting.   (Indeed, Doe had to withdraw from private competition in order to attend the School as a boarding student, and so he is now left with no avenue by which to compete this spring and summer. Doe has been forced to attend school virtually, through an online program, so that he will not fall further behind as he looks for another in-person institution that will accept him. This is particularly challenging for him, given his ADHD diagnosis. Further, Doe likely would have to attend three different schools for his junior and senior years, which will undoubtedly be a significant impediment in his college application and selection process.

<u>**COUNT II**</u>
**Breach of Contract**

79.     Doe repeats and re-avers each and every paragraph above, as if fully set forth herein.

80.     Both the I Care enrollment contract and the Student Handbook constitute a binding contract between the School and Doe.

81.     The Student Handbook defines the I Care Program as a non-disciplinary program and promises its students that they will not be disciplined if they invoke the protection afforded by the program, provided they comply with all of the requirements of the program.

82.     The Student Handbook sets forth the procedures necessary to invoke its protection as follows: "To activate the I Care process, students must communicate with any Hill employee about their own substance use/ possession, or use/possession by another student, BEFORE any School employee learns of, suspects, begins investigating, observes, detects, or discovers that student's substance use/possession or a violation of any School rule that subsequently reveals substance use/possession." (Ex. A at 94).

83.     The Student Handbook promises that, once invoked the "program allows students to get help for themselves or other students without a traditional disciplinary response if the procedures below are followed." (*Id.*).

84.     Upon information and belief, the I Care enrollment contract provides similar representations, promising in words or substance that Doe will not be disciplined for his substance related conduct if he complies with the requirements of the I Care program.

85.     Doe was referred to the I Care Program by a fellow student before his substance abuse and related conduct were known to the School.  Accordingly, Doe was entitled to invoke the protection of the program and avoid discipline for his substance abuse and related conduct

reported to the School and subsequently discovered by the School through Doe's participation in the I Care program.

86.     In violation of the express and implied promises contained within the Student Handbook, the School used the I Care Program to further investigate Doe and to obtain incriminating evidence concerning the extent of Doe's substance abuse, which information it used to retroactively sanction Doe in the form of a suspension and Conduct Warning designation.

87.     As a direct consequence of imposing these improper sanctions, Doe's disciplinary record subjected him to increased penalties for future infractions.  As such, Doe was required to withdraw from the School—in other words, he was expelled—when he committed a subsequent offense that was not sufficient on its own to warrant dismissal from the School, as evidenced by its widespread practice at the School and by the School's track record of discipline for similar conduct.  In fact, students who engaged in virtually identical behavior, but who did not have a disciplinary history, were not required to withdraw and instead received a sanction of either detention or suspension.  Further, participants in the same incident for which Doe was asked to withdraw were treated differently from Doe and were not asked to withdraw, merely to serve a suspension.

**COUNT III**
**Negligent Infliction of Emotional Distress**

88.     Doe repeats and re-avers each and every paragraph above, as if fully set forth herein.

89.     The School, with knowledge that Doe suffered from anxiety, depression, and other psychological ailments, acted negligently or with reckless indifference toward Doe in imposing unwarranted punishments against him both in connection with the non-disciplinary I

Care program and in connection with the watering prank.

90.    As a boarding school, the School stood *in loco parentis* to Doe and was aware of his precarious health situation based on his history of depression and substance abuse.  The School, therefore, had a special duty of care to provide for and protect Doe's emotional well-being and physical health and safety.

91.    The School further assumed a heightened duty to provide for Doe's mental and physical health when it assumed the responsibility for Doe's substance abuse rehabilitation through its acceptance of Doe into the I Care Program.

92.    Having accepted Doe into a rehabilitation program, the School was obligated not to arbitrarily discipline Doe, and to sanction him expulsion, separating Doe from his rehabilitation program, counselors, and support structures that were necessary for his recovery.

93.    It was foreseeable to the School that separating Doe from his counseling and rehabilitation program would have significant adverse impacts on Doe's physical and mental wellbeing.

94.    The School arbitrarily and improperly disciplined Doe with mandatory withdrawal for an offense that did not warrant dismissal in the absence of prior discipline.  Doe had a prior disciplinary history because the School improperly imposed retroactive sanctions against Doe in connection with his participation in the I Care program, which it did in violation of its express policies and promises.

95.    As a result of the above-described conduct, Doe has suffered and continues to suffer great pain of mind and body, shock, emotional distress, and physical manifestations of emotional distress, including shame, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; has suffered and continues to suffer and was prevented and will

continue to be prevented from obtaining the full enjoyment of life; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

**COUNT IV**
**Intentional Infliction of Emotional Distress**

96.     Doe repeats and re-avers each and every paragraph above as if fully set forth herein.

97.     The School, with knowledge that Doe suffered from anxiety, depression, and other psychological ailments, acted intentionally or with reckless indifference toward Doe in imposing unwarranted punishments against him both in connection with the non-disciplinary I Care program and in connection with the watering prank.

98.     The School imposed wrongful retroactive discipline against Doe in connection with his substance use for the express purpose, and with the intent, of manufacturing a justification to expel Doe for any future infraction.

99.     The School was aware at the time it relied upon that manufactured justification to expel Doe that Doe was entirely dependent upon the School to provide for his much needed psychological counseling and substance rehabilitation, and that removing him from those resources posed a significant risk to Doe's recovery.

100.     The School, acting with callous indifference, ignored that risk when it expelled Doe and separated him from his treatment program and support network.  The School intended its conduct to inflict severe emotional distress, or knew there was at least a high probability that its conduct would cause severe emotional distress to Doe.

101.     Doe's mental state and condition of deteriorated significantly as a result of the School's conduct.

102.     As a result of the above-described conduct, Doe has suffered and continues to

25

suffer great pain of mind and body, shock, emotional distress, and physical manifestations of emotional distress, including shame, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; has suffered and continues to suffer and was prevented and will continue to be prevented from obtaining the full enjoyment of life; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, John Doe demands the following relief from Defendant The Hill School:

a. The issuance of a temporary and permanent injunction ordering The Hill School to reverse the sanction of required withdrawal and to reinstate Doe as a student in good standing, subject to the appropriate discipline received by other students who engaged in similar conduct but were without a prior disciplinary history or Conduct Warning on their records, which should not exceed suspension for ten days, which Doe has already served having been separated from the School since February 13, 2023;

b. The issuance of injunctive relief prohibiting The Hill School from retaliating against Doe by refusing to offer him re-enrollment for the 2023-2024 academic year;

c. An award of compensatory damages in an amount exceeding $75,000 to be determined at trial;

d. An award of the costs and expenses of suit;

e. Attorneys' fees; and

f. Such other and further relief as the Court deems just, equitable, and proper.

## JURY DEMAND

Plaintiff John Doe demands a trial by jury on all issues so triable.

Date: March 29, 2023

/s/ Patricia M. Hamill
Patricia M. Hamill (PA Id. No. 48416)
Andrew S. Gallinaro (PA Id. No. 201326)
**CLARK HILL PLC**
Two Commerce Square
2001 Market Street, Suite 2620
Philadelphia, PA 19103
(t) (215) 640-8500/(f) (215) 640-8501
phamill@clarkhill.com
agallinaro@clarkhill.com

/s/ Joseph G. Poluka
Joseph G. Poluka (PA Bar No. 42035)
**BLANK ROME LLP**
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
joseph.poluka@blankrome.com
215-569-5624

*Attorneys for Plaintiff John Doe*

## VERIFICATION

The undersigned hereby swears under pains and penalties of perjury that the facts stated in the foregoing Verified Complaint are true and accurate to the best of his knowledge.

_____
John Doe