IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN DOE** | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 23-1210 |
| | : | |
| **THE HILL SCHOOL** | : | |

**MEMORANDUM**

**McHugh, J.**                                                                                                                                            **April 10, 2023**

      This is an action brought on behalf of a high school student at a residential boarding school who was required to withdraw as a result of his participation in an encounter with a fellow student that the school deemed to be an incident of bullying. Before that incident occurred, Plaintiff had been identified as a student who had problems with substance abuse, as a result of which he was enrolled in a health and wellness program at the school. He contends that he was wrongly expelled, because his expulsion was influenced in part by conduct related to his substance abuse for which he could not be sanctioned because of his participation in the program. He further contends that his expulsion violates the Americans with Disabilities Act and seeks a temporary restraining order reinstating him to the school. This young man's struggles are unfortunate, and I recognize that his expulsion is a meaningful setback for him, but he has not met the demanding standard for preliminary relief,[1] and his motion must therefore be denied.

---

[1] A plaintiff seeking a preliminary injunction or temporary restraining order must establish that they are likely to succeed on the merits, that they will likely suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in the plaintiff's favor, and that an injunction is in the public interest. *Pennsylvania v. DeJoy*, 490 F. Supp. 3d 833, 855 (E.D. Pa. 2020) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The first two factors must be established first, as they are the "most critical." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). "If both factors are established, however, the district court considers the two remaining factors" and assesses "whether the balance of all four factors warrants granting preliminary relief." *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 380 (3d Cir. 2021).

### I.     *Plaintiff cannot show a probability of success on his contract claim.*

Once plaintiff was admitted to the Hill School, his parents signed an enrollment contract. Enrollment Contract 2022-2023 School Year, ECF 20-1 at 122. That contract refers to the Hill School Handbook and the rules and regulations that govern student conduct. *Id.* at 2. Included within the Handbook is a description of a program known as Immediate Care, commonly referred to as I-Care. Student Handbook at 94-96, ECF 20-1 at 102-04. That program provides an option for students to avoid discipline connected to substance abuse by participating in a process of a therapeutic nature designed to divert them from continued self-destructive behavior. *Id*. It requires a student to enter a contract with certain commitments. *Id.*; *see also* I-Care Contract, ECF 20-1 a 127. As part of the consideration for these students' participation, the school agrees to forego discipline for actions related to the students' substance abuse so long as the student complies with program requirements. Student Handbook at 94.

Plaintiff contends that the I-Care program placed limitations on the school's ability to impose discipline, and that he was ultimately expelled only because the school improperly considered conduct related to Doe's substance abuse when sanctioning him for his later conduct. Specifically, before the bullying incident, Doe received a retroactive suspension for a major incident of misconduct and was placed on Conduct Warning, which provided notice that any additional violations could constitute a ground for immediate dismissal. Ariel Baum Decl. at ¶ 16, ECF 20-1 at 2. That sanction was imposed because school officials learned as part of their investigation into drug use on campus that Doe had attempted to assist another student in avoiding a positive test result for drug use by procuring a type of cleansing agent that would purportedly mask usage. *Id.* at ¶¶ 12-13. According to Doe, in the absence of this prior discipline—which he

maintains was improperly imposed—he would not have been expelled for his participation in the bullying incident.

This argument suffers from fundamental flaws. First, the enrollment contract sets forth the following, in a separate paragraph in bold italic font:

> ***Under this agreement and the Handbook, the headmaster or his/her designee has the sole discretion to require a student to withdraw, without the need to call for a Discipline Committee meeting, for the student's violation of any major School rule, accumulation of violation of minor School rules, suspected or confirmed criminal activity, and/or being a dangerous, negative, or detrimental influence on the school and/or its community.***

Enrollment Contract at 2. Somewhat similar language appears within the Handbook itself. Student Handbook at 68-70. Doe contends that this broad language is limited by the promise of immunity made to students when they enroll in I-Care, and that he relied upon such a promise when he admitted to certain drug-related conduct after his substance abuse was brought to the attention of school authorities. As an initial matter, given the breadth and clarity of this language, any limitations on the Headmaster's discretion stemming from a student's participation in I-Care should be strictly construed according to its terms. For present purposes, Doe can reasonably claim protection for discipline related to his own substance use. The scope of any further immunity rests within the discretion of school officials.[2]

Second, Doe's argument depends upon an unsupportable premise. Five students were disciplined as a result of the bullying incident: two were suspended and three were expelled. Baum Decl. at ¶¶ 28, 48, 53; Dr. Sylvia Rodriguez Vargas Decl. at ¶¶ 9-14, ECF 20-2 at 2-3. The other two students expelled, like Doe, had a prior disciplinary record. Vargas Decl. at ¶ 14. This leads

---

[2] Doe places great emphasis on an email from the Dean of Students to the Headmaster discussing the scope of the immunity conferred by I-Care, and whether Doe should be disciplined for supplying the drug-masking agent to another student. In my view, the email reflected the Dean's determination to act fairly with respect to Doe. It remained within the Headmaster's discretion to decide whether conduct that went beyond Doe's personal use warranted discipline.

Doe to conclude that in the absence of the prior suspension he would have been entitled to a lesser penalty. But such an assumption is unfounded, as there is no set formula that governs disciplinary decisions. As a student in a private school, Doe cannot invoke any rights of due process or equal protection unless they are rights conferred by contract. *See Swartley v. Hoffner*, 734 A.2d 915, 918-19 (Pa. Super. Ct. 1999). Here, under the terms of the enrollment contract and handbook alike, the Headmaster would have had absolute discretion to expel Doe even in the absence of any prior disciplinary record. The incident involved Doe dousing a sleeping classmate with water mixed with protein powered in the middle of the night, with two accomplices videotaping the incident and two watching from the doorway. Baum Decl. at ¶ 28. The Headmaster attested that the determining factor in her decision to require the withdrawal of three of the five students involved was their active role in the bullying incident, as compared to the others present who watched from the doorway. Vargas Decl. at ¶¶ 9, 14; *see also* Baum Decl. at ¶ 48. And within the subset of those actively involved, Doe had volunteered to throw the water. Baum Decl. at ¶ 28.

Finally, the evidence does not reflect a violation of the School's promises related to I-Care. Specifically, a student who enrolls is told that they will not be subject to discipline for conduct related to their substance abuse. The conduct for which Doe was first suspended did not involve his own usage but stemmed from his attempt to assist another student in circumventing the school's drug testing program. Plaintiff is correct that his participation in this conduct first came to light when Doe gave the school access to text messages on his phone as part of the I-Care enrollment process. But the record is also clear that the school was already aware that someone had delivered a bottle of cleansing agent to the testing room. Baum Decl. at ¶ 12. It was engaged in a wide-ranging investigation involving forty students, and staff separately learned of Doe's involvement

4

in supplying the cleansing agent from other sources. *Id.* at ¶ 13; Vargas Decl. at ¶ 7. At argument, Doe's counsel summarily contended that once Doe made the admission in connection with his enrollment in I-Care, the school was required to ignore information from any other source. Counsel cited no language from the contract or handbook to support such a proposition, nor any legal authority, and I note that, even in the context of constitutional law, a violation of Fourth Amendment rights is deemed harmless where the same evidence would have inevitably been discovered. *See Nix v. Williams*, 467 U.S. 431, 444 (1984). Doe's attempt to help another student evade detection had nothing to do with his own substance abuse and was not therefore covered by the I-Care promise of immunity. And school officials appropriately deemed the risk to fellow students had his efforts been successful to be of grave concern. Baum Decl. at ¶ 14-16.

Nor can it be said that Doe was unaware of the risk presented by virtue of his disciplinary status when he participated in the dormitory bullying. His statement to school officials after the incident reflected his knowledge that any further infraction could be grounds for dismissal. The "but for" chain of events on which he now relies is a retrospective analysis conjured by counsel.

II.   *Plaintiff cannot show a probability of success on his ADA claim*

The ADA is applicable here because Hill constitutes a "secondary school," and therefore a "public accommodation" under 42 U.S.C. § 12181(7)(J). It is also true that substance abuse does in some instances qualify as a disability under the ADA. 42 U.S.C. § 12210. But even if Doe succeeded in establishing that he meets the qualifications for disability under the Act, he was not dismissed because of substance abuse but rather for his participation in a bullying incident at a point in time when, by his own admission, he was not impaired because he had abstained from any drug use by virtue of his participation in I-Care. The ADA requires reasonable accommodations, but as one District Court has held, a school is "not required to compromise the integrity of the

school's policies, values and/or academic requirements in order to 'accommodate' a student's disability." *DMP v. Fay Sch. ex rel. Bd. of Trustees*, 933 F. Supp. 2d 214, 222 (D. Mass. 2013). Even if a student seeks to attribute misconduct to disability, and Doe does not, a school is not required to overlook behavior that merits disciplinary action. *See Halpern v. Wake Forest Univ. Health Sciences,* 669 F.3d 454, 465 (4th Cir. 2012).

Doe offered no argument advancing his ADA claim at the hearing on his motion for emergency relief, and on the record as it stands, I see a small likelihood of his succeeding on this claim.

### III. *Remaining factors*

Having not found a likelihood of success on the merits, I will only briefly address the remaining factors. As to irreparable harm, case law cited by the parties makes clear that courts are divided when it comes to assessing the significance of an expulsion from a school and similar academic sanctions. *Compare Doe v. Univ. of Cin.*, 872 F.3d 393, 407 (6th Cir. 2017); and *Doe v. Univ. of Conn.*, No. 3:20CV92 (MPS), 2020 WL 406356, at *2 (D. Conn. Jan. 23, 2020); *with Doe v. Univ. of Scis.*, No. CV 19-358, 2020 WL 5211028, at *4 (E.D. Pa. Sept. 1, 2020); and *Mahmood v. Nat'l Bd. of Med. Examiners*, No. 12-1544, 2012 WL 2368462, at *5 (E.D. Pa. June 21, 2012); and *Doe v. Princeton Univ.*, 3:20-CV-No. 20-4352-BRM-TJB, 2020 WL 2097991, at *7 (D.N.J. May 1, 2020). I am not prepared to hold that there are no circumstances where dismissal from a high school could represent irreparable harm. Here, at a minimum, Doe has suffered significant harm because it appears that his enrollment in the I-Care program had made a meaningful difference with respect to his substance abuse, his overall mental health, and his academic performance. *See* Letter from John Doe's Psychiatrist, ECF 2-1. And I accept his mother's testimony at the emergency relief hearing that the isolation created by the pandemic had

a significant negative impact given Doe's particular needs, rendering his participation in the Hill School community particularly beneficial.  But given his family's support and resources and the School's recognition that it continues to have an obligation to help with his transition, it is not clear that the harm cannot be ameliorated.  And any harm suffered by Doe must be weighed against the harm identified by the School that would likely follow from his reinstatement.

In that regard, I credit the testimony of Dean of Students Ariel Baum at the emergency relief hearing, whom I deemed to be sincere and convincing in explaining how seriously the School views both Doe's involvement in the attempt to frustrate the school's drug screening program and his participation in the bullying incident that led to Doe's dismissal.  The school had particular concerns about the victim of the incident, who had been previously targeted, and students were explicitly warned to desist from the very conduct in which Doe engaged.  Baum Decl. at ¶¶ 28-35.  They were also given the opportunity to admit their involvement, with the knowledge that failure to do so would likely result in expulsion.  *Id.* at 36.  School officials are clearly in the best position to set and enforce disciplinary rules, particularly in a residential setting, and except in the clearest of cases judges are ill equipped to substitute their views from afar.  In this case, where Doe was one of three students expelled following the unanimous recommendation of a six-member Disciplinary Committee that was adopted by the Headmaster, *id.* at ¶¶ 37-48; Vargas Decl. at ¶¶ 11-14, a court order reinstating a student would be particularly disruptive and ill advised.

I will therefore deny Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction.

      /s/ Gerald Austin McHugh
United States District Judge