**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOHN DOE, | : | |
| | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | No.  2:23-cv-01210-GAM |
| | : | |
| THE HILL SCHOOL, et al. | : | (Oral argument requested) |
| Defendants. | : | |
| | : | |

---

**PLAINTIFF'S BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**

---

Patricia M. Hamill (PA ID No. 48416)
Andrew S. Gallinaro (PA ID No. 201326)

**CLARK HILL PLC**
Two Commerce Square
2001 Market Street, Suite 2620
Philadelphia, PA 19103
(t) (215) 640-8500/(f) (215) 640-8501
phamill@clarkhill.com
agallinaro@clarkhill.com

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

DOE'S FACTUAL ALLEGATIONS................................................................................ 8

   I.   Doe enrolls in The Hill School. ................................................................ 8

   II.  Doe enrolls in the School's non-disciplinary substance rehabilitation program and is improperly and retroactively disciplined in violation of the School's policies. .................. 9

   III.  Doe is caught participating in a dormitory prank and expelled. ........................................ 14

   IV.  The sham disciplinary process and sanction—the School wrongfully exploits Doe's substance use history to justify his expulsion. ................................................................ 16

LEGAL ARGUMENT.................................................................................................... 22

   I.   Standard on a motion to dismiss for failure to state a claim ............................................. 22

   II.  Doe plausibly pleads a claim for breach of contract........................................................ 23

   III.  Doe plausibly pleads a claim for promissory estoppel. ................................................... 28

   IV.  The "gist of the action" doctrine does not preclude Doe's tort claims. .......................... 30

   V.   Doe plausibly pleads a claim for intentional infliction of emotional distress................... 32

   VI.  Doe plausibly pleads a claim for negligent infliction of emotional distress..................... 36

   VII. Doe plausibly pleads a claim for discrimination under the ADA. .................................. 40

     A.  Qualified Disability ................................................................................ 41

     B.  Discriminated Against On the Basis of Disability ........................................ 45

     C.  Denial of Services ................................................................................ 47

CONCLUSION.............................................................................................................. 48

## **INTRODUCTION**

This case concerns improper disciplinary action taken by Defendants The Hill School and Ariel Baum, Assistant Head of School and Dean of Students, following a flawed hearing with a pre-ordained outcome against Plaintiff John Doe, an eleventh-grade African American student during one of the most vulnerable and precarious periods of his young life. In the fall of 2022, Doe enrolled at The Hill School following a difficult year at his previous school, where he had struggled due to that school's Covid-triggered hybrid approach to learning. When Doe enrolled at The Hill School, Defendants knew that Doe suffered from attention deficit disorder (ADD), depression, and anxiety.

Unbeknownst to Doe or his parents, at the time Doe made his decision to attend The Hill School, the School was battling a wide-spread drug use problem among its student population. Unfortunately, Doe was caught up in this culture almost immediately upon entering The Hill School, as he used marijuana and tobacco products as a means of managing his depression and anxiety as well as a way of fitting in with his peers. Doe's substance use had significant adverse impacts upon both his mental health and his ability to function as a student, both academically and socially.

On December 12, 2022, one of Doe's classmates reported Doe's marijuana and nicotine use to The Hill School. Because this was reported to the School by a fellow student, there is no dispute that Doe was entitled under the Student Handbook to enroll in the School's non-disciplinary Immediate Care ("I Care") Program. The Hill School promises that the I Care program "allows students to get help for themselves or other students without a traditional disciplinary response if the procedures below are followed" and provides an "initial wellness and safety-based alternative to the deterrence of Hill's disciplinary system...." The I Care program

not only promises a non-disciplinary response to the possession/use of drugs, but also the possession and use of "drug paraphernalia." Doe's reasonable expectation in entering the program, and the reasonable expectation of anyone reading the School's I Care rules, was that he would have amnesty for his drug-related conduct, including the possession and use of a detox product intended to mask one's drug use – which satisfies the definition of "drug paraphernalia' under both state and federal law—up until the point of his admission to I Care. Dean Baum himself had this reasonable interpretation of the rules —he admitted as much in an internal email to the Head of School where he reflected that I Care "protects everything, including substance usage, distribution, and even other rules broken related to that usage." There is no dispute that Doe fully cooperated with the I Care procedures, and as part of his I Care entry, he disclosed his own possession/use of marijuana and nicotine as well as drug paraphernalia.

During the intake process, Doe disclosed that, while under the influence of THC in December 2022, he provided a drug "detox" drink purchased on Amazon to another student, which that student wrongly believed would allow him to test negative in a drug test administered by the School. The ill-advised plan failed as the School was already aware of that student's drug use. But the investigation into that incident, coupled with Doe's admission into I Care and the disclosures he made concerning his marijuana and nicotine use and drug-related conduct, placed Doe in the crosshairs of a powerful disciplinary figure at The Hill School – Assistant Head of School and Dean of Students Ariel Baum. Dean Baum not only oversaw the I Care intake process, but he was also investigating and trying to stamp out the wide-spread drug problem at The Hill School that caused roughly fifty students to be admitted to I Care at or around the same time as Doe – an embarrassing blemish for the prestigious private boarding school.

For reasons that are not yet clear (perhaps because of Doe's race), Dean Baum wrongly concluded that Doe was somehow at the epicenter of the School's drug problem and became fixated on ridding Doe from The Hill School. Even though Dean Baum understood that Doe could not be punished given his participation in I Care, he nevertheless cooked up a scheme to discipline Doe and brand him with a probationary status that would ensure his expulsion for any future infraction – however slight. Dean Baum hatched this plan over the winter break, after Doe had already been admitted to I Care, and laid out his proposal in an email to the interim head of school that explicitly acknowledged the tenuousness of his plan. Nevertheless, after school resumed in January, a full month after Doe's intake into the I Care program, Dean Baum sprang on Doe a "retroactive suspension" and a permanent Conduct Warning on Doe for providing the detox drink to a classmate – something Defendants had known about from the first I Care interview Dean Baum conducted with Doe a month before. Dean Baum announced the retroactive discipline while Doe was under the care of the School's treatment program and with knowledge of his fragile state and delicate substance recovery prospects. The plan to pad Doe's record for future use, unfortunately, did not take long to bear fruit.

In February 2023, Doe participated in a popular but juvenile prank against another student — a prank that was commonplace and has never resulted in expulsion in any of the multiple other occurrences before and after Doe's incident. Doe tossed a Dixie cup of water and protein powder on a sleeping classmate. Dean Baum, knowing that he had the opportunity he was looking for, orchestrated a formal Discipline Committee hearing to adjudicate Doe for this infraction. Notably, the School had never adjudicated this type of prank using its formal hearing process before – and in all prior instances students received only detention, or less. But for Doe, that result would not be tenable. Because Dean Baum served as the chair of the Discipline

Committee, he knew he would have the ability to steer the result to his desired outcome and ensure Doe's expulsion. While the School asserts that the Discipline Committee Process was designed to give Doe more procedural fairness, it was actually a means for Dean Baum to exert more control over the outcome and expel Doe because of his substance abuse and addiction.

Dean Baum took every advantage his position as Chair afforded him to tilt the scale. For example, when Dean Baum prepared Doe for what to expect at his hearing during several Zoom meetings, he falsely assured Doe that his I Care status and associated discipline would not be relevant at his hearing, and instructed Doe that if asked, he should note only that he was previously punished for being "untruthful." But then Dean Baum made Doe's history of marijuana and nicotine dependency and associated (wrongful) disciplinary history a primary focus of the hearing process. The Discipline Committee's decision letter, authored by Dean Baum, focused more than half its rationale on Doe's prior substance use and associated disciplinary history that was imposed against Doe in breach of the I Care promise of amnesty. Dean Baum's use of that justification for Doe's expulsion was spelled out in plain language in the committee's decision letter: "Even though I Care is non-disciplinary, what we learned during that process is that the extensiveness of [Doe's] substance possession, usage, and distribution on campus over several months demonstrated extraordinary risk taking. ... the totality of his decision making caused his position to be untenable, especially the proximity between his suspension and placement on Conduct Warning, and these most recent infractions."

Though the School claims that the Discipline Committee only had the power to recommend a sanction, and that the Head of School (who was serving on an interim basis) exercised her discretion to expel Doe, Doe has pled that the interim Head of School instead exercised no discretion at all and deferred entirely to Dean Baum. Doe's Complaint cites as

evidence the fact that the Head of School did not even read the Discipline Committee's decision when supposedly exercising her discretion to ignore all precedent and expel Doe for a commonplace prank at the School. Moreover, the ability to exercise discretion is not unfettered and certainly may not be arbitrary or animated by improper purposes. As Doe's Complaint makes clear, there was ample precedent for Doe's conduct making clear that it is not an offense that the School believes warrants expulsion in the absence of an exacerbating prior disciplinary history. And Doe has clearly pleaded why his prior disciplinary history violated The Hill School's contractual promises. Once expelled, Doe lost the critical support structure and substance treatment program on which Doe and his family had come to depend, causing significant upheaval in his life and a devastating toll on his emotional well-being.

Against this factual backdrop, Defendants have moved to dismiss Doe's First Amended Complaint in its entirety. First, Defendants argue that Doe has not pleaded a breach of contract, disregarding that they specifically promised that students like Doe in I Care would not be disciplined for prior possession/use of drugs or—significantly—drug paraphernalia. As set forth below, the detox drink that Defendants assert does not fall within the protection of I Care is clearly an item of drug paraphernalia under both state and federal law, which should inform this Court's determination as to the scope of The Hill School's promise of amnesty for prior substance-related conduct. Defendants also argue, without merit, that following the convening of a Disciplinary Committee, they may dispense with the corresponding Disciplinary Committee procedures since the Head of School purportedly has the right not to convene a Disciplinary Committee in the first place. But having elected to utilize those procedures, Defendants were obligated to follow them.

Defendants next argue that promissory estoppel is not available since Doe has pleaded an enforceable contract. Defendants fail to mention that they recently disclaimed the existence of an enforceable contract with Doe, and that promissory estoppel may be argued in the alternative to a breach of contract claim. Specifically, Doe has alleged that he and his family relied on The Hill School's promise that Doe would not be disciplined for his use/possession of marijuana and nicotine and drug paraphernalia when Doe chose to return to The Hill School and enroll in the I Care program. Had Doe and his parents known that Defendants would break their promise, Doe would have selected medical leave and would not have returned to The Hill School. That is sufficient to establish a claim for promissory estoppel.

Defendants next argue, under the "gist of the action" doctrine, that Doe cannot assert intentional infliction of emotional distress ("IIED") or negligent infliction of emotional distress ("NIED"). This is so, according to Defendants, because they conclude without analysis that "all of Doe's allegations arise from his enrollment at Hill and the School's application of its written policies" (written policies that Defendants recently claimed were not contractually binding). Defendants are wrong. Doe's IIED and NIED claims rest on allegations sounding in broader social duties owed to all individuals—duties in tort—and not merely duties resting on contractual compliance. In any event, this Court has refused to decide motions to dismiss based on the "gist of the action" doctrine because it can be difficult to discern the "gist" of a claim at this stage.

Turning specifically to Doe's IIED claim, Defendants make several arguments. First, Defendants argue that their conduct was not sufficiently outrageous or extreme to qualify as IIED. Defendants ignore that the Restatement notes that extreme and outrageous conduct may arise from two scenarios present here: (1) an actor's abuse of a position of authority over another, such as the authority of a school over a student; and (2) an actor's knowledge that

another is peculiarly susceptible to emotional distress by reason of mental condition. IIED is adequately pleaded in this case, as Defendants—acting with animus and potentially racial bias against Doe—manufactured a disciplinary history for Doe that enabled the School to sever him from a drug rehabilitation program that he was critically reliant upon, all the while knowing that Doe was in a fragile mental state. Second, Defendants take issue with Doe's alleged harms. But Doe has pled the precise types of harm that this Court has found sufficient for an IIED claim.

Defendants then urge dismissal of Doe's NIED claim. Under the form of NIED liability in which Doe is proceeding, based on the Pennsylvania Supreme Court's decision in *Toney v. Chester County Hospital*, a negligent breach of contractual or fiduciary duty will trigger liability when the defendant owes an implied duty to care for the plaintiff's emotional well-being and when a breach holds the potential for deep emotional harm. As argued below, Doe pleads exactly that scenario, though not in the physician-patient relationship discussed in *Toney*. Defendants argue that liability under the *Toney* standard does not extend to the school-student relationship. However, Defendants cite no controlling precedent for this proposition and ignore that this Court previously declined to foreclose liability in the context of a student-school relationship where the claim involved a student with a disability.

Finally, Defendants argue that Doe's claims cannot survive under the Americans with Disabilities Act ("ADA"). Defendants' analysis falters for multiple reasons: *First*, Defendants applied the wrong standard, relying on a "failure to accommodate" claim instead of the "discrimination" claim that Doe actually brought. *Second*, Defendants argue that Doe has not adequately pled a qualifying disability. But Doe has adequately alleged a qualifying disability by pleading a drug addiction that substantially limited his ability to think, communicate, and interact with others. Though Defendants now argue that Doe's substance use was trivial and did not

interfere with his life, at the time of his enrollment in I Care, the School felt very differently —

The Hill School's addiction specialist determined that Doe needed significant medical

intervention to address his substance dependency. This specialist even suggested that Doe take

six to twelve weeks for in-patient recovery treatment as a potential alternative to the I Care

program. *Third*, Defendants argue that Doe has not pled that he was discriminated against on the

basis of a disability. But Doe has clearly alleged that Defendants improperly based their decision

to expel him on his drug dependency—a point that cannot be disputed given the written decision

of the Discipline Committee explicitly relying on his drug use and discipline.

Defendants have failed to meet their burden to show that, when the allegations in the First

Amended Complaint are presumed true, that they cannot be held liable for any of the misconduct

alleged. The Court should deny Defendants' motion in its entirety.

## DOE'S FACTUAL ALLEGATIONS

### I.     Doe enrolls in The Hill School.

Prior to enrolling at The Hill School, Doe completed three years of high school in his

hometown, where he was known as a dedicated athlete and a softspoken teen. (ECF 30 at 1 (¶

1)).[1] Learning during the Covid pandemic was quite detrimental to Doe, who had been diagnosed

with ADD from the age of eight. (*Id.* at 1-2 (¶ 1)). The long stint of isolation followed by a

hybrid learning format left Doe floundering. (*Id.*) His self-confidence plummeted as he fell

behind in his academics. (*Id.*) With his parents, Doe made the decision to voluntarily repeat his

junior year and get a fresh start at a new school to better prepare for college. (*Id.* at 2 (¶ 2)).

---

[1] All page citations to the record in this document are to the blue page numbers stamped by the Court in the header.

Doe matriculated at The Hill School as a junior and boarding student in the fall of 2022. (*Id.* at 10 (¶¶ 24)). His matriculation marked the first time he would be living away from home and, unfortunately, he had difficulty making the adjustment. (*Id.* at 11 (¶ 26)).

## II.   Doe enrolls in the School's non-disciplinary substance rehabilitation program and is improperly and retroactively disciplined in violation of the School's policies.

Unbeknownst to Doe or his parents, at the time Doe made his decision to attend The Hill School, the School was battling a wide-spread drug use problem among its student population— the School was unable to control the prevalence and availability of drugs among students on its campus, which was particularly problematic for its boarding students. (*Id.* at 2 (¶ 3), 11 (¶ 27)). Unfortunately, Doe was caught up in this culture almost immediately upon entering the School, as he used marijuana and tobacco products as a means of managing his depression and anxiety as well as a way of fitting in with his peers. (*Id.* at 11 (¶ 27)). Doe's substance use had significant adverse impacts upon both his mental health and emotional well-being as well as on his ability to function as a student. (*Id.* at 11 (¶ 28)).

In early/mid-December 2022, a classmate reported Doe's substance use to the School. Because Doe's substance use was reported by a fellow student, it fell within the safe harbor of the School's non-disciplinary Immediate Care ("I Care") program. (*Id.* at 32 (¶ 102)). According to the Student Handbook: "[t]he [I Care] program allows students to get help for themselves or other students without a traditional disciplinary response if the procedures below are followed" and provides an "initial wellness and safety-based alternative to the deterrence of Hill's disciplinary system…." (*Id.* at 3 (¶ 7), 12 (¶ 30), 32 (¶ 100); ECF 30-1 at 95). The Student Handbook sets forth the procedures necessary to invoke its protection and makes clear that to invoke the protection of the program, a student need only turn himself in, or be turned in by

fellow student. (ECF 30 at 31 (¶ 99); ECF 30-1 at 95). The I Care procedures define "substances" to include possession of "any drug paraphernalia." (ECF 30-1 at 97).

Once invoked, the I Care program promises that students will not be disciplined for their substance use or their participation in the I Care program if they comply with the strictures of the program, which include an initial assessment (including allowing the School to search the student's room and access the students' phone), a promise of non-use going forward by the student, an agreement to submit to random substance testing, and participation in ongoing one-on-one and group counseling provided by School counselors. (ECF 30 at 12 (¶ 31); ECF 30-1 at 95-96; ECF 30-2 at 2).

Doe's substance use was first discovered on or about December 9, and the School determined that his condition was severe enough that he was sent home for the final week of the Fall Term (Dec. 12-16, 2022) to begin his recovery with his family. (ECF 30 at 12 (¶ 32)). But before Doe was sent home, and as part of the I Care enrollment process, Doe was brought to an administrator's office to be questioned about his usage and was required to identify other students at the School who also were using. (ECF 30 at 13 (¶ 33)). As part of the I Care intake enrollment process, and as a condition of his participation in the I Care program, Doe was asked to sign a separate I Care contract that set forth his obligations to comply with the requirements of the program. (*Id.*; ECF 30-2 at 2).

The administrators, including the Assistant Head of School, Defendant Ari Baum, also ordered Doe to turn over his cell phone and provide his password, and Doe complied. (ECF 30 at 4 (¶ 9), 13 (¶ 34)). Dean Baum went through Doe's phone and focused on a series of text messages Doe had exchanged with a friend concerning their drug use and ordered Doe to take screen shots of the texts in which Dean Baum was interested. (*Id.* at 4 (¶ 9), 12-13 (¶ 34)). Dean

10

Baum then directed Doe to send those screen shots to him and, curiously, to also delete the originals from Doe's phone. (*Id.*). Notably, these texts were obtained by the School through the mandatory cooperation required of its "non-disciplinary" I Care enrollment process. The texts taken by the School reflected that another student had asked Doe to bring him a detoxifying drink previously purchased on Amazon that purportedly would allow the person who drank it to avoid testing positive for marijuana, and that Doe had brought one of the drinks to the other student who had been asked to submit to a drug test. (*Id.* at 14 (¶ 35)). Notably, Doe was under the influence of THC at the time he agreed to bring the detox drink to his friend, which impacted his decision-making. (*Id.*).

Doe returned home with his parents and remained out of school for the week of December 12 to focus on his recovery. (*Id.* at 12 (¶ 32), 15-16 (¶ 41)). Winter recess immediately followed from December 16, 2022 through January 3, 2023, during which time Doe stayed with family. (*Id.* at 15-16 (¶ 41)). The Hill School's addiction specialist, Lisa Roethling, had determined that Doe needed significant medical intervention to address his substance dependency and she communicated to Doe's parents that they should consider inpatient treatment options for Doe if they were not inclined to have him return and participate in the I Care program. (*Id.* at 4-5 (¶ 10), 37 (¶¶ 128-129)). Doe and his family carefully considered two options presented by Ms. Roethling: (1) take a medical leave from school for 6-12 weeks for inpatient substance use treatment; or (2) take time over winter break to begin getting better and return to school in January to get treatment via the I Care program while remaining enrolled in school. (*Id.* at (¶ 10), 37 (¶ 130)).

After significant contemplation and reflection, Doe and his parents determined The Hill School remained the best environment for Doe to get well, where he would be continuing his

education and working alongside more than 40 of his fellow schoolmates who would also be taking part in the I Care program to recover from their substance use. (*Id.*). Doe and his parents made this critical decision without knowledge of the improper disciplinary action that awaited Doe when he returned from the December holiday break. (*Id.* at 5 (¶ 10), 37 (¶¶ 130, 132)).

At this time, the School did not let Doe or his parents know that in spite of promises to the contrary, Dean Baum would seek to circumvent the School's own rules and policies to retroactively punish Doe with a permanent probation status. (*Id.* at 5 (¶ 11)). Had they known this information, they would have deliberated very differently, knowing that Doe would be under heightened scrutiny and consequently elevated stress in his daily student life. (*Id.* at 5 (¶ 11), 37 (¶ 131)). As an adolescent already being treated for anxiety and depression, this added factor was critically important, but was not shared with Doe or the family until after the fact. (*Id.* at 5 (¶ 11)).

On January 4, 2023, Doe returned to school for the start of the Winter Term and began treatment with the I Care program. (*Id.* at 16 (¶ 41)). On January 10, 2023, a full month after Doe entered the School's I Care program, the School back-pedaled on its promise of amnesty. (*Id.* at 5 (¶ 12), 17 (¶ 45)). Unbeknownst to Doe and his family, members of the administration — Dean Baum and Interim Head of School Dr. Sylvia Rodriguez Vargas — had been internally discussing whether to sanction Doe, even while acknowledging that to do so would likely violate the non-disciplinary policy of the I Care program. (*Id.* at 5 (¶ 12), 16 (¶ 43)). Dean Baum specifically recognized that "I Care protects everything, including substance usage, distribution, and even other rules broken related to that usage." (*Id.* at 5 (¶ 12), 16 (¶ 43), 18 (¶ 47)).

On January 10, a week after Doe returned from Winter recess, and a full month after the School discovered Doe's substance use and delivery of the detox drink to a fellow student, Dean

Baum wrote to Doe's parents to provide them with an "update" on Doe's "status at The Hill School, both in terms of health and wellness, as well as discipline." (*Id.* at 17 (¶ 45)). In that communication, despite referencing the "non-disciplinary" nature of the I Care program repeatedly, Dean Baum explained the School was nevertheless imposing retroactive discipline against Doe based upon the information uncovered through the I Care enrollment process. (*Id.* at 18 (¶ 47)). Dean Baum's letter stated that "[e]ven though I Care is not disciplinary, these actions [referring to Doe bringing the detox drink to another student in an effort to avoid drug detection] took place prior to his referral to and placement in I Care, therefore making it appropriate that he be formally disciplined." (*Id.*). Dean Baum explained that Doe would be "retroactively" suspended for the time he was away from school (December 12-16) and that he was being placed on "Conduct Warning," which the School defines as a probationary period during which the student is on notice that future disciplinary infractions will result in an increased chance of dismissal from the School. (*Id.* at 17 (¶¶ 45, 46)). This calculated act of "retroactive" discipline for information the School gathered a month earlier was done for the purpose of making it easier for the School to get rid of Doe for any future infraction, no matter how insignificant. (*Id.* at 6 (¶ 12)). Dean Baum announced the "retroactive" discipline while Doe was under the care of the School's treatment program and with knowledge of his fragile state, pre-existing depression and anxiety and delicate substance recovery prospects. (*Id.* at 6 (¶ 12), 17 (¶ 44)).

Despite the improper imposition of discipline against Doe through his participation in I Care, Doe and his parents did not at that time challenge the sanction given that the suspension was limited to "time served" for the time he was already out of school. (*Id.* at 18 (¶ 48)). Moreover, Doe and his parents both recognized that the opportunity to participate in the School's I Care Program, where Doe would receive much-needed counseling and guidance from a

licensed therapist while remaining a member of the School community, was of paramount importance. (*Id.*). Doe and his parents were understandably focused on Doe's health and well-being and were not attuned to the potential consequences of the School's improper imposition of a "Conduct Warning" against Doe, particularly given the repeated (but false) assurances by the School that Doe's participation in I Care was "non-disciplinary." (*Id.* at 18 (¶ 49)). But if Doe and his parents had known back when Ms. Roethling discussed treatment options that Doe would be "retroactively" suspended and placed on permanent Conduct Warning, he would not have returned to the School. (*Id.* at 37 (¶ 131)).

### III.    Doe is caught participating in a dormitory prank and expelled.

Unsurprisingly for a boarding school, there exists a prevalent culture and history of pranking at The Hill School. Students routinely play jokes and pull pranks on one another in the dormitories. (*Id.* at 19 (¶ 51)). For seniors, the Student Handbook explicitly condones certain types of pranks – noting that "Sixth form [senior] pranks are a hallowed tradition and acceptable if they are carried out in a positive manner." (*Id.*).

In early February 2023, Doe was on the receiving end of a particular prank the students called "watering," where students would sneak into the room of a sleeping classmate and toss water on him in his bed. (*Id.* at 20 (¶ 53)). Watering had been taking place regularly since the beginning of the school year, but with great frequency in Doe's dormitory. (*Id.*). Doe accepted the prank for what it was: annoying in the moment but goofy adolescent fun, not intended to harm anyone. (*Id.*). As such, he did not report his experience to the School. However, these types of pranks apparently were widespread and had occurred with enough frequency that the Dorm Parents assigned to Doe's dormitory called for a dorm-wide meeting on or about February 7, 2023 where they instructed the students to stop. (*Id.* at 20 (¶ 54)). However, the Dorm Parents

did not suggest the type of punishment a student might receive for engaging in the pranking

behavior. (*Id.*). At the time of the dorm meeting, Doe was aware that several students who were

caught engaging in "watering" pranks during the prior academic term had received only

detention as a sanction. (*Id.* at 20 (¶ 55)). Doe had no appreciation that engaging in pranks could

result in expulsion, as he had never heard of it happening. (*Id.* at 21 (¶ 55)).

The following weekend, February 11-12, Doe was up late on a Saturday night / Sunday

morning attempting to remain alert for anyone who might try to prank him again. (*Id.* at 21 (¶

56)). Doe then went into the room across the hall where he heard a commotion and encountered

roughly ten students who were discussing pranking another student that night. (*Id.* at 21 (¶ 57)).

Among the group were four senior students—two seniors and two postgrads —who decided that

they were going to water another student that night. (*Id.*). The four students had been granted

permission from their Dorm Parents to have a sleepover and were together in one room. (*Id.*).

The upperclassmen encouraged Doe to take part in the watering prank. (*Id.*). As a new student

and a junior still finding his niche, Doe felt strong social pressure from these upperclassmen to

participate in the prank. (*Id.*).

Not surprisingly, the group designated the newest and youngest student by year, Doe, to

toss the water while the others either stood watch or recorded the prank with their cell phones.

(*Id.* at 21 (¶ 58)). One of the upperclassmen retrieved a cup of protein powder from his room and

handed it to Doe, instructing him to toss the powder along with a Dixie cup of water on the

sleeping student. Doe followed through, and the group quickly fled. (*Id.*).

From Doe's perspective, the group had randomly selected the student to prank. (*Id.* at 22

(¶ 59)). But unbeknownst to Doe, the student (whom Doe knew and considered a friend) had

experienced bullying from others in the dorm, including from some in the group of four who

were staying together, and recently had complained to the School. (*Id.*). The Dorm Parents apparently had called a meeting for the students living on the same floor as the targeted student to warn them to leave this student alone. (*Id.*). Because Doe did not live on that floor, he did not receive that warning and was unaware of the targeted student's unfortunate history. (*Id.*).

The morning after Doe participated in the "watering" prank, the Dorm Parents called a meeting of the entire dormitory (roughly 50 students) in the common area on the first floor. (*Id.* at 22 (¶ 61)). The Dorm Parents instructed the group that they would give the perpetrators of the prank just a few minutes to step forward, threatening that any students who did not identify themselves would be severely disciplined. (*Id.*). Doe was frightened and confused by the instruction and the seemingly incongruent threat of a severe penalty for what he viewed as a harmless prank. (*Id.* at 22 (¶ 62)). As such, he did not step forward, and neither did the other four students. (*Id.*). However, the targeted student had already identified the five students involved to the Dorm Parents. (*Id.*). When the time to self-identify expired, the five students, including Doe, were told to remain while the rest of the residents were excused. (*Id.*). The students were then separated and made to write statements of what occurred. (*Id.* at 23 (¶ 63)). After Doe completed his statement (in which he truthfully confessed his role in the prank), he was shocked to be immediately suspended and told to wait for his parents to pick him up and take him home. (*Id.*).

## IV.   The sham disciplinary process and sanction—the School wrongfully exploits Doe's substance use history to justify his expulsion.

The School advised Doe that it had elected to address his conduct violation through its disciplinary hearing process, which was overseen by Dean Baum, who served as chair of the Discipline Committee (and who also oversaw Doe's enrollment in the I Care program). (*Id.* at 23 (¶ 64)). Notably, although watering was common at the School, no other students who have engaged in the same prank, before or since, have been subject to a formal disciplinary hearing.

(*Id.*). On information and belief, Dean Baum had predetermined that Doe would be expelled, and he elected to proceed with a Discipline Committee proceeding to create the illusion that Doe was being given a fair process prior to his expulsion. (*Id.* at 23 (¶ 65)). In other words, the Discipline Committee hearing was a sham. (*Id.*)

The Student Handbook describes the disciplinary hearing process as follows:

> The Discipline Committee convenes to hear cases involving the violation of major school rules, including recurring failure to adhere to lesser school rules. It also serves as an advisory group to the Deans' Office. During the discipline process, parents are to remain off campus so that the student involved may focus on their responsibilities with the Discipline Committee. A student who is brought before the Discipline Committee may choose a faculty member and another Hill student to serve as formal supporters before, during, and after the hearing. Following a question-and-answer period to clarify the student's disciplinary case and history, the student and their supporters can then speak to the character of the student under review. After the statements have been heard, if there are no further questions, the student and their supporters will be excused from the meeting to allow the Committee to deliberate. During this deliberation, the Committee will consider the student's entire Hill School record. The Committee will then vote on a recommendation to the Head of School on appropriate next steps for the student and community, including whether the student should be required to withdraw from The Hill School. When the final decision is made by the Head of School, it first will be communicated to the student and then to the student's parents. The Dean of Students and/or the Head of School will share the appropriate details of each case with faculty and students.

(*Id.* at 24 (¶ 67); ECF 30-1 at 60).

While Doe was home on interim suspension following the watering to await his disciplinary hearing, he had two meetings with Dean Baum via Zoom to discuss the Discipline Committee process. (ECF 30 at 24 (¶ 68)). During these preparatory meetings, Doe asked Dean Baum whether his participation in I Care and the circumstances that led to his enrollment in the program were relevant and whether he should address that topic in his own statements to the

Discipline Committee. (*Id.* at 24 (¶ 69)). Dean Baum instructed Doe that I Care was not relevant to the proceedings and that he should limit his discussion of what led to his placement on Conduct Warning to simply stating that he had been "dishonest." (*Id.*). Doe relied upon Dean Baum's now clearly misleading advice. (*Id.*).

Doe's parents had several meetings with Ms. Roethling in connection with the hearing. (*Id.* at 25 (¶ 71)). Doe's parents were deeply concerned that any separation from the School would also separate Doe from the I Care program and the counseling services upon which Doe depended for his recovery and continued wellbeing. (*Id.*). Ms. Roethling shared this concern and later told Doe's parents that she had attempted to advocate on Doe's behalf at the Discipline Committee hearing. (*Id.* at 25 (¶ 72)). Specifically, she wanted to provide the context of the important recovery progress Doe had made after six weeks in I Care and the critical nature of the first 12 weeks of the program, but she advised Doe's parents that Dean Baum would not permit her to do so. (*Id.*).

Doe's hearing took place on February 16, 2023. Dean Baum, acting as the non-voting chair and moderator, took an active role in the hearing process. (*Id.* at 25 (¶ 73)). Despite his instruction to Doe not to discuss his prior Conduct Warning in any detail, Dean Baum took it upon himself to advise the Discipline Committee that Doe had received a Conduct Warning for "interfering with a medical investigation"—referring to Doe's and his friends' consumption of a "detox" drink to avoid testing positive for marijuana use. (*Id.*). Dean Baum also prepared a factual statement that he read to the Discipline Committee at the start of the hearing, ostensibly providing what Dean Baum characterized as the relevant undisputed facts for consideration. (*Id.* at 25-26 (¶ 74)). As part of the statement, Dean Baum made improper references to the events that led to Doe's enrollment in the non-disciplinary I Care program, which took Doe by surprise

given Dean Baum's prior instructions not to discuss the events around his enrollment in I Care—
an enrollment process that Dean Baum conducted and oversaw. (*Id.* at 26 (¶ 74)). Dean Baum's
factual recitation noted: "[p]rior to the events of February 12, [Doe] had significant challenges
with his conduct and the disciplinary system. In December, he deliberately acted in ways that
deeply undermined The Hill School and its medical and investigative processes. More
specifically, [Doe] went out of his way to interfere with a major School investigation. For these
dishonest actions, [Doe] was retroactively suspended from December 12-16 and placed on
Conduct Warning for the remainder of his time at The Hill School. […] his pattern of behavior is
very troubling, including especially the proximity between his prior placement on Conduct
Warning and these most recent infractions." (*Id.*).

These statements were gross exaggerations of Doe's substance use and related conduct
that led Doe to enroll in the I Care program and his subsequent (improper) discipline. (*Id.* at 26
(¶ 75)). Doe himself made thoughtful opening and closing statements to the Discipline
Committee where he truthfully acknowledged his role in the pranking, expressed remorse for any
harm that he caused to the student who had been "watered," and followed Dean Baum's
instruction to the letter that he reference being on conduct warning for being "untruthful" in the
past, while avoiding detailed mention of his participation in I Care. (*Id.* at 26 (¶ 76)). Upon
information and belief, Dean Baum also made further improper disclosures to the Discipline
Committee about Doe's substance use during deliberations, outside of Doe's presence, in an
attempt to influence the Committee's vote against Doe. (*Id.* at 27 (¶ 78)). Those efforts were
successful. (*Id.* at 27 (¶ 79)). The Discipline Committee voted unanimously to find Doe
"responsible" for "Bullying" and "Disrespectful Behavior" and recommended to the Interim

Head of School, Dr. Sylvia Rodriguez Vargas, that Doe be required to withdraw from the School. (*Id.*).

Dean Baum in particular knew at the time he manufactured a justification to expel Doe that Doe's health and well-being were at a precarious inflection point. (*Id.* at 35 (¶ 118)). Doe was suffering from, and receiving treatment for, depression and anxiety and was dependent upon the School to provide for his much needed psychological counseling and substance rehabilitation. (*Id.*). Despite having that knowledge, Dean Baum remained unconcerned and callous to the fact that removing Doe from the School's resources posed a significant risk to Doe's recovery. (*Id.*).

Dean Baum acted with callous indifference and ignored that risk when he orchestrated the recommendation of the Discipline Committee to expel Doe. The School accepted that recommendation despite knowing it would separate Doe from a treatment program and support network that Doe needed and that was working to restore Doe to good health. (*Id.* at 35 (¶ 119)). The School and Dean Baum intended their conduct to inflict severe emotional distress, or knew there was at least a high probability that their conduct would cause severe emotional distress to Doe. (*Id.*).

On February 17, 2022, Dean Baum sent a letter to Doe's parents outlining the result of Doe's disciplinary hearing and explaining the basis for the School's decision to expel Doe. (*Id.* at 27 (¶ 80)). The decision letter made clear—in plain and explicit terms—that Doe's substance use was a motivating factor in the School's decision. (*Id.*). The letter explained the School's rationale for the severity of the sanction as follows:

> [Doe's] placement on Conduct Warning was outlined in detail in a January 10 email that I sent to your family. I also met with [Doe] around this time to express with candor how precarious his position at The Hill School would be if he were involved in any

future school violations. It should also be noted that the January 10 email summary also included detail around [Doe] being placed on I Care in December. *Even though I Care is non-disciplinary, what we learned during that process is that the extensiveness of his substance possession, usage, and distribution on campus over several months demonstrated extraordinary risk taking. … the totality of his decision making caused his position to be untenable, especially the proximity between his suspension and placement on Conduct Warning, and these most recent infractions.*

(*Id.* at 28 (¶ 82)) (emphasis added).

Doe's parents immediately objected to the School's use against their son of information received because of his participation in I Care. (*Id.* at 28 (¶ 83)). They made repeated attempts to meet with School officials to voice their concerns: not only was Doe being improperly disciplined, but he also was losing access to a critical support program that had been instrumental in his recovery and physical and emotional health. (*Id.*). Doe's parents submitted a letter from Doe's private therapist disclosing to the School how precarious his health situation was, the significant negative impacts the events already had on Doe, and the heightened risk to Doe of relapse without access to the treatment previously provided to him by the School. (*Id.* at 28 (¶ 84)).

Doe's parents also made multiple requests for a face-to-face meeting with Dr. Vargas, who had final decision-making authority on Doe's status. (*Id.* at 28 (¶ 85)). But for a brief phone call immediately after the decision was issued in which no information was provided, Doe's parents' requests were rejected. (*Id.*). Toward the very end of the brief call, Dr. Vargas stated, "I am sorry for the gap in care"—acknowledging the significance of Doe being removed from the I Care program without a bridge for continuing care during this fragile phase of recovery. (*Id.*). Despite the School's stated commitment to the values of "honesty and genuineness, courtesy and

respect, and gratitude and concern for the greater good," not one administrator was willing to meet with Doe's parents to hear and address their concerns. (*Id.*).

Doe has since learned that of the four other students who participated in the watering prank with him, the two seniors who had prior disciplinary infractions were required to withdraw, while the two post-grads who were without disciplinary history were suspended for no more than ten days. (*Id.* at 29 (¶ 87)). As such, it appears that prior disciplinary history was the deciding factor in whether the School imposed withdrawal on the students involved in this incident. (*Id.*). Doe also has learned that in the weeks after this incident, at least three more students were caught "watering" in separate incidents, and that none of those students were required to attend a formal disciplinary hearing or withdraw. (*Id.* at 29 (¶ 88)). As such, Doe asserts that he has been singled out for disparate treatment based upon his history of substance use and the School's improper imposition of a sanction against him in the context of the non-disciplinary I Care program. (*Id.*).

Defendants' conduct has had a devastating mental impact upon Doe, including worsening depression and anxiety, which has required medical and psychological treatment, therapy, and counseling. (*Id.* at 9 (¶ 16), 36 (¶¶ 120, 121)).

## LEGAL ARGUMENT

### I.      Standard on a motion to dismiss for failure to state a claim

"On a motion to dismiss, a court must 'accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff.'" *Doe v. Princeton Univ.*, 30 F.4th 335, 345 (3d Cir. 2022) (quoting *Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008)) ("Following that rule, we recount only the facts described in the Complaint."). To survive a motion to dismiss, a complaint must provide "a short and plain statement of the claim showing

that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). That requires "plausibly suggesting" facts sufficient to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But the court should "disregard legal conclusions and recitals of the elements of a cause of action supported by mere conclusory statements." *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016).

## II.   Doe plausibly pleads a claim for breach of contract.

A claim for breach of contract under Pennsylvania law requires: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages. *Davis*, 824 F.3d at 351; *McShea v. City of Philadelphia*, 606 Pa. 88, 995 A.2d 334, 340 (Pa. 2010). A school has a contractual obligation to its students to abide by its own stated policies, and a school's failure to do so can give rise to a claim of breach of contract by an affected student. *See Reardon v. Allegheny Coll.*, 926 A.2d 477, 480 (Pa. Super. Ct. 2007) (Pennsylvania courts "review the agreement between the parties concerning disciplinary procedures, contained within a portion of the student handbook…as we would any other agreement between two private parties."); *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. Ct. 1999) ("[T]he relationship between a private educational institution and an enrolled student is contractual in nature; therefore, a student can bring a cause of action against said institution for breach of contract where the institution ignores or violates portions of the written contract."). Contrary to Defendants' claim that compliance with a school contract need only be "substantial," the Supreme Court of Pennsylvania has indicated that compliance should be "to the letter." *See Murphy v. Duquesne Univ. Of The Holy Ghost*, 565 Pa. 571, 598, 777 A.2d 418, 434 (Pa. 2001) (referring to a private university's disciplinary procedures for disciplining a faculty member).

Defendants' motion does not dispute that The Hill School's procedures form a contract or that Doe has pled damages resulting from a breach of that contract. Defendants challenge only that Doe has adequately pleaded a breach of a duty imposed by the contract. Defendants are mistaken. Doe has pleaded that The Hill School's policy states that the I Care program "allows students to get help for themselves or other students *without a traditional disciplinary response*" if the program's procedures are followed and that the program provides an "alternative to the deterrence of Hill's disciplinary system." (ECF 30 at 3 (¶ 7), 12 (¶ 30), 32 (¶ 100); ECF 30-1 at 95, 96) (emphasis added). In Defendants' words, I Care "provides a diversion from standard discipline for a student's drug use." (ECF 33-1 at 17). Doe has also pleaded that Defendants breached these promises by: (1) retroactively suspending him and imposing a Conduct Warning for drug-related conduct that he disclosed through the I Care program; and (2) using that sham discipline against him during the Disciplinary Committee proceeding (and admitting to having done so).[2] (ECF 30 at 5-7 (¶¶ 11-13), 17 (¶¶ 44-46), 18 (¶ 49), 24 (¶ 69), 25 (¶ 73), 26 (¶¶ 74, 76), 28 (¶ 82), 32 (¶ 103), 34 (¶ 112), 35 (¶ 117), 37 (¶¶ 131, 133); ECF 30-1 at 115).

Defendants suggest that there can be no breach because their Head of School has "sole discretion to require a student to withdraw, without the need to call for a Discipline Committee meeting." (ECF 33-1 at 14). But those terms are irrelevant here because Defendants *did elect* to convene a Discipline Committee and to proceed under the corresponding procedures. (ECF 30 at 6-7 (¶ 13), 23-24 (¶¶ 65-69), 25-27 (¶¶ 72-74, 76-79), 29 (¶ 86), 35 (¶ 119)). Further, if the Head of School had chosen herself to decide on discipline, she still would have been limited by

---

[2] Further illustrating the bogus nature of the discipline, there is no such thing as a "retroactive" suspension in Defendants' Handbook or in the Enrollment Contract. (ECF 30-1 at 2-113; ECF 33-2 at 2-5). Rather, under the Handbook, a suspension is required to "begin[] immediately." (ECF 30-1 at 64).

Defendants' promise that drug-related conduct disclosed during the I Care process not play a role in that discipline.

Defendants also argue that the I Care policy did not protect against Doe's disclosure of having provided a masking/cleansing agent to another student. This too is mistaken. As an initial matter, the School's head disciplinarian, Dean Baum, spelled out in internal correspondence his own interpretation of the scope of the I Care program's promise of amnesty: "it covers everything, including substance usage, distribution, and even other rules broken related to that usage." (ECF 30 at 5 (¶ 12), 16 (¶ 43), 18 (¶ 47)). When students truthfully disclose their usage, even if they previously attempted to hide that usage, the program promises they will not be disciplined. That is what Doe did, and that is the understanding he had when he shared the information that allowed Dean Baum to determine Doe's involvement in delivering the detox drink to a friend. Doe is entitled to the reasonable inference at this stage of the litigation that I Care's promise of amnesty for drug-related behavior covered his act of bringing a detox drink to a friend.

In fact, this is the only reasonable inference in light of additional language within the School's Handbook making clear that the detox drink qualifies as "drug paraphernalia," and is explicitly covered by I Care as a covered "substance." The Handbook states that the I Care process is triggered when a student "communicate[s] with any Hill employee about their own *substance use/possession*, or use/possession by another student, BEFORE any School employee learns of, suspects, begins investigating, observes, detects, or discovers that student's *substance use/possession* or a violation of ay [sic] School rule that subsequently reveals substance use/possession." (ECF 30 at 31 (¶ 99); ECF 30-1 at 95) (emphasis added). And the I Care rules explain what is meant by "substances":

> For the purposes of I Care, possession of improper "substances" is defined as possessing or controlling alcohol in any amount, prescription medications that do not comply in type or amount with one's own prescription, drugs in any amount including marijuana and THC, *and any drug paraphernalia* or electronic delivery method devices, even if the devices are purported to be used for nicotine-only products.

(ECF 30-1 at 97) (emphasis added). Thus, applying the I Care rules, a student's disclosure of his or her use of "drug paraphernalia" through the I Care process will not lead to discipline.

A drug masking/cleansing agent is "drug paraphernalia." While the I Care rules do not define "drug paraphernalia," Pennsylvania and federal law do provide guidance. *See* 21 U.S.C. § 863; 35 Pa. Stat. Ann. § 780-102. Both statutes broadly define that term as "any equipment, *product, or material of any kind* which is primarily intended or designed for use in manufacturing, compounding, converting, *concealing*, producing, processing, preparing, injecting, ingesting, inhaling, or otherwise introducing into the human body *a controlled substance*." *Id.* (emphasis added). In determining whether something is "drug paraphernalia," both statutes instruct the reader to consider "logically relevant factors," including the "existence and scope of legitimate uses of the item in the community." *Id.* The Pennsylvania statute states that the following factors should also be considered: "statements by an owner or anyone in control of the object concerning its use," the "proximity of the object, in time and space, to a direct violation of this act," the "proximity of the object to controlled substances," and "direct or circumstantial evidence of the intent of an owner, or of anyone in control of the object, to deliver it to persons who he knows, or should reasonably know, intend to use the object to facilitate a violation of this act." 35 Pa. Stat. Ann. § 780-102.[3] The purpose of the masking agent delivered by Doe was to conceal the existence of marijuana from a drug test. (ECF 30 at 13 (¶ 35), 25 (¶

---

[3] Defendants themselves turned to federal law to argue about the meaning of "distribution." (ECF 33-1 at 10).

73)). That is what Doe and the other student intended. (*Id.*). And since Doe alleges that he informed Defendants through the I Care process that he and a friend used that "drug paraphernalia," (ECF 30 at 13-14 (¶¶ 34-35)), he sufficiently alleges breaches by pleading that Defendants disciplined and ultimately expelled him based on that conduct.[4]

To the extent that Defendants dispute that a drug masking/cleansing agent qualifies as "drug paraphernalia" under the I Care rules, the meaning of the term as it is used in the Handbook is, at the very least, ambiguous. "Contract language is ambiguous if it is reasonably susceptible to more than one construction and meaning." *Pennsylvania Nat. Mut. Cas. Ins. Co. v. St. John*, 630 Pa. 1, 24, 106 A.3d 1, 14 (Pa. 2014). Since the I Care rules do not define "drug paraphernalia" and since federal and state statutes defining drug paraphernalia clearly encompass drug masking/cleansing agents, Doe's construction is more than reasonable, and certainly plausible. If the Court finds the Handbook ambiguous on the meaning of "drug paraphernalia," the contract must be construed against Defendants. *See Com., Dep't of Transp. v. Semanderes*, 109 Pa. Cmwlth. 505, 511, 531 A.2d 815, 818 (Pa. Commw. Ct. 1987) ("When a contract is ambiguous, it is undisputed that the rule of *contra proferentem* requires the language to be construed against the drafter…and in favor of the other party if the latter's interpretation is reasonable.").[5]

Accordingly, there is no basis to dismiss Doe's count for breach of contract.

---

[4] Should Defendants claim that they knew of or suspected Doe's involvement in delivering the detox drink before Doe disclosed that information, the Court may not credit that claim at this stage. Doe's well-pleaded factual averments are the only facts the Court may consider.

[5] Indeed, the meaning of an ambiguous contractual term becomes a question for the fact finder—not a question for the Court. *See Pac. Employers Ins. Co. v. Global Reinsurance Corp. of Am.*, 693 F.3d 417, 426 (3d Cir. 2012) ("If…we conclude that the language is ambiguous, we leave it to a fact-finder to decide its meaning."); *Connect Info. Tech. Civ. Action Pros., LLC v. MedMatica Consulting Assocs.*, No. 20-994, 2021 WL 3629093, at *3-4 (E.D. Pa. Aug. 17, 2021) (denying motion for summary judgment partly because contract at issue was ambiguous); *KDH Elec. Sys., Inc. v. Curtis Tech. Ltd.*, 826 F. Supp. 2d 782, 797 (E.D. Pa. 2011) (denying motion to dismiss because of ambiguity in an agreement).

**III.    Doe plausibly pleads a claim for promissory estoppel.**

A claim for promissory estoppel requires that "the promisor made a promise that he

should have reasonably expected to induce action or forbearance on the part of the promisee; 2)

the promisee actually took action or refrained from taking action in reliance on the promise; and

3) injustice can be avoided only by enforcing the promise." *Edwards v. Wyatt*, 335 F.3d 261, 277

(3d Cir. 2003); *Crouse v. Cyclops Indus.*, 560 Pa. 394, 403, 745 A.2d 606, 610 (Pa. 2000).

Initially, Defendants urge the Court to dismiss Doe's promissory estoppel claim because

Doe "explicitly asserts contractual protections under the Handbook and I Care contract." (ECF

33-1 at 19). But courts permit litigants to plead promissory estoppel as an alternative to breach of

contract and reject dismissal of the former claim as premature until a determination can be made

about the latter claim. *See Brown v. Brown, Inc. v. Cola*, 745 F. Supp. 2d 588, 626-27 (E.D. Pa.

2010); *Olivia B. ex rel. Bijon B. v. Sankofa Academy Charter Sch.*, No. 14-867, 2014 WL

7238390, at *6 (E.D. Pa. Dec. 19, 2014); *Resolution Trust Corp. v. Baker*, No. 93-93, 1994 WL

637359, at *6 (E.D. Pa. Nov. 14, 1994). Indeed, Defendants' position on whether such a contract

exists—or whether it would encompass the same terms that Doe has alleged—is not entirely

clear. (ECF 20 at 3, 6, 15, 16) (repeatedly placing "contract" in quotation marks and denying that

the Handbook is contractually binding). In any event, the mere fact that Doe claims that the

Handbook is an enforceable contract is not a basis to dismiss his promissory estoppel claim.

Next, Defendants argue that the promises that Doe alleges are "too vague to induce

reliance." (ECF 33-1 at 20). But the promise that participation in the I Care program would be

non-disciplinary is express and definite. Doe has pleaded that The Hill School's policy states that

the I Care program "allows students to get help for themselves or other students *without a*

*traditional disciplinary response*" if the program's procedures are followed. (ECF 30 at 3 (¶ 7),

12 (¶ 30), 32 (¶ 100); ECF 30-1 at 95) (emphasis added). Doe has further alleged that the

School's policy defines the program as providing an "alternative to the deterrence of Hill's disciplinary system." (ECF 30 at 12 (¶ 30); ECF 30-1 at 96). That promise of a non-disciplinary response applied to Doe's pre-intake possession of "drug paraphernalia," as discussed above.

Defendants also argue that Doe was "unreasonable" to rely on Defendants' promise. But whether reliance is reasonable is a question of fact, and courts typically refuse to dismiss under Rule 12(b)(6) on this ground. *See Azer Scientific Inc. v. Quidel Corp.*, No. 21-2972, 2021 WL 5918655, at *5 (E.D. Pa. Dec. 15, 2021); *K7 Design Grp., Inc. v. Five Below, Inc.*, 540 F. Supp. 3d 508, 513 (E.D. Pa. 2021); *Achenbach v. Atlantic Specialty Ins. Co.*, No. 17-534, 2018 WL 5264304, at *7 (E.D. Pa. Oct. 22, 2018). Further, The Hill School promised that the I Care program would not entail "a traditional disciplinary response" and specified that a participant's use of "drug paraphernalia" would be protected. (ECF 30 at 3 (¶ 7), 12 (¶ 30), 32 (¶ 100); ECF 30-1 at 95, 96) (emphasis added). Defendants accepted Doe into the I Care program following his disclosure that he possessed drug paraphernalia (the drug masking agent). (ECF 30 at 4 (¶ 9), 13-14 (¶¶ 34, 35), 36 (¶ 126), 37 (¶ 127)). Doe has sufficiently alleged reasonable reliance on Defendants' promises in the pleadings stage; the reasonability of Doe's reliance on Defendants' promise that he would not be disciplined for possession of drug paraphernalia is a factual determination that should be left to a jury.

Finally, Defendants argue that Doe did not change his position in reliance on Defendants' promises. However, a promissory estoppel claim does not require a "change in position." This claim may rest on *refraining* from taking action, as Defendants acknowledge earlier in their memorandum. (ECF 33-1 at 19 (quoting *Edwards v. Wyatt*, 335 F.3d 261, 277 (3d Cir. 2003)). Doe alleged that he decided to remain at The Hill School and participate in the I Care program, rather than to withdraw and seek outside medical help, based on Defendants' promise that no

disciplinary action would be taken against him. (ECF 30 at 37 (¶ 130)). Thus, Doe has

adequately alleged that he refrained from taking action based on a promise by Defendants.

Accordingly, Doe has pleaded a claim for promissory estoppel.

**IV.    The "gist of the action" doctrine does not preclude Doe's tort claims.**

Defendants argue that all of Doe's allegations arise from contractual duties and that his

tort claims must therefore be dismissed under the "gist of the action" doctrine. This argument is

wrong and premature.

Initially, the Court should reject this argument because Defendants' position on whether

such a contract exists—or whether it would encompass the same terms that Doe has alleged—is

not entirely clear and Plaintiff is permitted to plead in the alternative. (ECF 20 at 3, 6, 15, 16)

(repeatedly placing "contract" in quotation marks and denying that the Handbook is contractually

binding). *See Frank C. Pollara Grp. LLC v. Ocean View Inv. Holding, LLC*, 784 F.3d 177, 189

(3d Cir. 2015) (noting that "a number of district courts in this Circuit have been rightly reluctant

to apply the gist-of-the action doctrine when the existence of a contract is still in controversy,"

and listing those cases).

Further, assuming that a contract does exist, that alone would not bar tort claims,

including in the private school context. *See Wartluft v. Milton Hershey Sch.*, 354 F. Supp. 3d

584, 591 (M.D. Pa. 2018); *Dobson v. Milton Hershey Sch.*, 356 F. Supp. 3d 428, 437 (M.D. Pa.

2018), *Mirabella v. William Penn Charter Sch.*, No. 15-1162, 2016 WL 7042208, at *4 (E.D. Pa.

Feb. 24, 2016). "A contract between a student and a private institution may establish certain

rights and obligations, but it is axiomatic that there may be other legal duties owed by private

institutions to their students defined by different sources of law, including tort law." *Dobson*, 356

F. Supp. 3d at 437; *Warluft*, 354 F. Supp. 3d at 591.

In determining whether the "gist of the action" doctrine applies, courts look to "the nature of the duty alleged to have been breached." *Dobson*, 356 F. Supp. 3d at 436 (citing *Bruno v. Erie Ins. Co.*, 630 Pa. 79, 106 A.3d 48, 68 (Pa. 2014)); *Warluft*, 354 F. Supp. 3d at 591 (citing same). Defendants acknowledge this standard. (ECF 33-1 at 22). "If the duty is created by the terms of the parties' agreement, then the claim sounds in breach of contract; if it derives from a defendant's 'broader social duty owed to all individuals,' the claim must be regarded as a tort." *Id.* (citing *Bruno*, 106 A.3d at 68-69). In previous decisions, this Court has acknowledged that it can be difficult to discern the "gist" of a plaintiff's claim at the motion to dismiss stage, and has therefore exercised caution in dismissing claims based on the "gist of the action" doctrine. *See Dehart v. Homeq Servicing Corp.*, No. 11-416, 2012 WL 12895695, at *5 (E.D. Pa. Oct. 15, 2012), *aff'd*, 679 F. App'x 184 (3d Cir. Feb. 8, 2017); *Interwave Tech., Inc. v. Rockwell Automation, Inc*., No. 5-398, 2005 WL 3605272, at *13 (E.D. Pa. Dec. 30, 2005).

Defendants assert that Doe's IIED and NIED claims attempt to "recast" Doe's contract claims as torts. This is not correct. In the *Wartluft* case, the U.S. District Court for the Middle District of Pennsylvania found that IIED and NIED claims against a private school were not barred by the "gist of the action" doctrine where the plaintiffs alleged that the school expelled a student with serious mental health issues. *See Warluft*, 354 F. Supp. 3d at 592-93. In the IIED claim here, Doe alleges that: (1) Defendants knew that Doe suffered from anxiety, depression, and other mental ailments—and further that he was dependent on The Hill School for treating his substance use issues; (2) Dean Baum nonetheless callously manufactured an improper justification to expel Doe; and (3) because Defendants ejected Doe from The Hill School's support network, Doe suffered severe emotional distress. (ECF 30 at 5-7 (¶¶ 12-13), 9 (¶ 16), 35-36 (¶¶ 116-121)). In the NIED claim here, Doe alleges that: (1) Defendants stood *in loco*

31

*parentis* to Doe; (2) Defendants knew of Doe's psychological ailments and substance use, and therefore owed a special duty of care to provide for his well-being; (3) Defendants assumed a higher duty to provide for Doe's mental and physical health by accepting him into the I Care program; (4) Defendants foresaw that separating Doe from his support network at The Hill School would significantly damage Doe's wellbeing; (5) Defendants arbitrarily and improperly expelled Doe despite the foregoing; (6) Defendants made no provision for Doe's continued care following his dismissal; and (7) as a result, Doe has suffered emotional distress. (ECF 30 at 33-34 (¶¶ 107-114)). Doe's IIED and NIED allegations implicate broader social duties owed to all individuals, not compliance with a contract.

Accordingly, the "gist of the action" doctrine does not preclude Doe's tort claims.

## V.     Doe plausibly pleads a claim for intentional infliction of emotional distress.

Intentional infliction of emotional distress is defined as follows: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Shaner v. Synthes*, 204 F.3d 494, 507 (3d Cir. 2000) (quoting *Hoy v. Angelone*, 554 Pa. 134, 720 A.2d 745, 753 (Pa. 1998)).

Pennsylvania follows the Restatement (Second) of Torts for IIED claims. *See Greiser v. Drinkard*, 516 F. Supp. 3d 430, 440 (E.D. Pa. 2021); *Weinstein v. Bullick*, 827 F. Supp. 1193, 1203 (E.D. Pa. 1993); *Hoy*, 720 A.2d at 753. The Restatement notes that the "extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." Restatement (Second) of Torts § 46 cmt. e (1965). In that vein, the Restatement notes that school authorities have been found liable for "extreme abuse of their

position." *Id.* The First Circuit recently found, in a university case, that a student "'stands in a particularly vulnerable relationship vis-a-vis the university, the administration, and the faculty.'" *Doe v. Brown Univ.*, 43 F.4th 195, 210 (1st Cir. 2022) (quoting *Russell v. Salve Regina Coll.*, 649 F. Supp. 391, 402 (D.R.I. 1986)). For that reason, a school can "'fairly be expected' to act 'maturely – and even with some tenderness and solicitude – toward' its students." *Id.* This principle is especially true in the high school context. The Restatement also notes another circumstance in which extreme and outrageous conduct may flow: "from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity." Restatement (Second) of Torts § 46 cmt f.

Defendants argue that Doe has not alleged extreme or outrageous conduct. Doe respectfully disagrees. Doe has alleged the following facts relevant to his IIED claim:

- Before Doe's expulsion, he labored through ADD, major depression, and anxiety at The Hill School, and Defendants knew this. Defendants knew of Doe's fragile mental state. (ECF 30 at 1-2 (¶ 1), 5 (¶ 11), 6 (¶ 12), 11 (¶¶ 25, 27), 19 (¶ 50), 33 (¶¶ 107, 108), 35 (¶¶ 116, 118), 36 (¶ 121)).

- Soon after enrolling at The Hill School, Doe became caught up in the School's wide-spread drug abuse problem and was using drugs—namely marijuana and nicotine—himself. (*Id.* at 3 (¶ 8), 11 (¶ 27), 14 (¶¶ 35, 37)). The Hill School's addiction specialist became extremely concerned for Doe's safety, stated that he needed significant medical intervention, and advised his parents to choose between the I Care program or a 6–12-week medical leave to seek addiction treatment. (*Id.* at 4-5 (¶ 10), 15 (¶ 39)).

- Doe chose the I Care program, a drug rehabilitation program that the School's Handbook stated came "without a traditional disciplinary response." (ECF 30 at 3 (¶ 7), 12 (¶ 30),

32, (¶ 100); ECF 30-1 at 95).

- The Hill School represented: "For the purposes of I Care, possession of improper 'substances' is defined as possessing or controlling alcohol in any amount, prescription medications that do not comply in type or amount with one's own prescription, drugs in any amount including marijuana and THC, *and any drug paraphernalia* or electronic delivery method devices, even if the devices are purported to be used for nicotine-only products." (ECF 30-1 at 97) (emphasis added).

- During the I Care enrollment process, Doe disclosed texts to Defendants showing that he had recently provided a detox drink to another student for the purpose of masking marijuana from a drug test. (ECF 30 at 4 (¶ 9), 13-14 (¶¶ 34-35), 25 (¶ 73), 36 (¶ 126)). As discussed above, this was drug-related conduct that Dean Baum conceded in internal correspondence was likely covered by I Care. Moreover, the detox agent was encompassed under the School's policy as "drug paraphernalia" that falls under the safe harbor of I Care.

- Notwithstanding the I Care rules, Defendants sanctioned Doe with a "retroactive" suspension and a Conduct Warning for his possession of drug paraphernalia disclosed during the I Care intake process. (*Id.* at 6 (¶ 12), 17-18 (¶¶ 44, 45, 46, 47, 48), 26 (¶ 74), 32 (¶ 103), 37 (¶ 133)). Defendants fabricated these sanctions in order to pad Doe's disciplinary record and thereby heighten the consequences of any later disciplinary incidents. (*Id.* at 6 (¶ 12), 35 (¶ 117)). Dean Baum personally disliked Doe, wrongly believed Doe was largely to blame for the School's pre-existing drug problem, and may have been racially biased against him. (*Id.* at 6 (¶ 12), 8 (¶ 14), 27 (¶ 81), 37 (¶ 131)).

- Following Doe's involvement in a popular prank that Defendants had tolerated from

34

others, Defendants held a sham hearing and used the manufactured suspension and Conduct Warning as a basis to expel Doe from The Hill School. (*Id.* at 2 (¶ 5), 3 (¶ 6), 7 (¶ 13), 8 (¶ 15), 32 (¶ 104), 35 (¶¶ 117, 118)).

- Defendants' expulsion of Doe—in his fragile mental state—necessarily removed him from a treatment program and a support network that Doe needed and that was working to restore him to good health. (*Id.* at 9 (¶ 16), 28 (¶ 83), 34 (¶ 110), 35 (¶ 119)). Doe has been devastated as a result of Defendants' conduct, suffering worsening depression and anxiety. (*Id.* at 9 (¶ 16), 36 (¶ 120)).

In sum, Doe has alleged reprehensible conduct by Defendants who knew of his precarious mental state. Additionally, Doe was particularly vulnerable by virtue of his boarding student-secondary school relationship with Defendants. Doe has plausibly pleaded a claim for intentional infliction of emotional distress.

Defendants rely on this Court's decision in *Doe v. Abington Friends School* to argue that the conduct alleged by Doe is not sufficiently outrageous or extreme. *The Abington* Friends decision describes the plaintiffs' IIED claim as merely a school's "alleged failure to follow its policies for investigating and resolving bullying complaints." *Doe v. Abington Friends School*, No. 22-14, 2022 WL 16722322, *6 (E.D. Pa. Nov. 4, 2022). Defendants' conduct here is far worse. After Doe got caught up in The Hill School's uncontrolled drug culture, Defendants pushed Doe to enroll in a rehabilitation program that promised no disciplinary consequences for drug-related behavior. Once enrolled in that program, Defendants—acting with animus and potentially racial bias against Doe—severely punished him for conduct that should have been immunized in order to pad his disciplinary record. Defendants then expelled Doe based partly on

that protected conduct, severing him from the rehabilitation program upon which he relied for his health. This goes far beyond a policy compliance matter, as in the *Abington Friends School* case.

Finally, Defendants take issue with the nature and specificity of Doe's harm. An IIED claim requires allegations of severe emotional distress. *See Shaner*, 204 F.3d at 507; *Hoy*, 720 A.2d at 753. Doe has alleged that Defendants' conduct has had a "devastating mental impact including worsening depression and anxiety"—which has required "medical and psychological treatment, therapy, and counseling." (ECF 30 at 9 (¶ 16), 36 (¶¶ 120, 121)). Physical harm is unnecessary for an IIED claim, which Defendants incorrectly suggest on page 19 of their memorandum. *See Mest v. Cabot Corp.*, 449 F.3d 502, 519 (3d Cir. 2006); *Asanov v. Hunt*, No. 5-470, 2006 WL 8448185, at *8 (M.D. Pa. Oct. 27, 2006); *Papieves v. Lawrence*, 437 Pa. 373, 380, 263 A.2d 118, 121 (Pa. 1970). This Court has found allegations of anger, anxiety, depression, disappointment, embarrassment, emotional harm, fear, humiliation, mental anguish, shame, stress and worry sufficient for IIED claims. *See, e.g., Lane v. Cole*, 88 F. Supp. 2d 402, 407 (E.D. Pa. 2000); *Corbett v. Morgenstern*, 934 F. Supp. 680, 684-85 (E.D. Pa. 1996).

Accordingly, Doe has pleaded a claim for intentional infliction of emotional distress.

**VI.    Doe plausibly pleads a claim for negligent infliction of emotional distress.**

In Pennsylvania, a claim for negligent infliction of emotional distress may flow from a "negligent breach of a contractual or fiduciary duty" where the defendant owes an implied duty to care for the plaintiff's emotional well-being and where a breach holds the potential for deep emotional harm. *See Toney v. Chester Cnty. Hosp.*, 614 Pa. 98, 100, 117, 36 A.3d 83, 84, 95 (Pa. 2011). No physical impact or injury is necessary, contrary to Defendants' assertion at page 19 of their memorandum. *See id.* at 100, 123. However, the emotional harm "must not be the type that a reasonable person is expected to bear." *Id.* at 117.

36

Doe has made out a claim for NIED under the *Toney* standards described above. First, Doe has alleged that Defendants owed him contractual duties under The Hill School's Handbook and the I Care contract. (ECF 30 at 4 (¶ 9), 6 (¶ 12), 7 (¶ 13), 12 (¶ 31), 13 (¶ 33), 16 (¶ 42), 18 (¶ 48), 31 (¶¶ 97-103), 34 (¶ 112); ECF 30-1 at 42-153; ECF 30-2 at 2)).

Second, Doe has also alleged that Defendants owed him duties sounding in tort. Doe has alleged that The Hill School is a boarding school standing in *loco parentis* to its students. (ECF 30 at 33 (¶ 108)). The Hill School even has "dorm parents" assigned to supervise students in their dormitories. (ECF 30 at 20 (¶ 54), 21 (¶ 57), 22 (¶¶ 59-62); ECF 30-1 at 9, 16, 19, 20, 21, 22, 25, 26, 27, 36, 46, 67, 72, 75, 94, 97, 102, 114)). Statements of Defendants' purported regard for students' safety and physical and emotional well-being appear frequently in the Handbook and other documentation. (ECF 30-1 at 22, 60, 64, 65, 67, 71, 72, 77, 80, 82, 83, 88-90, 93-95, 109). The I Care program is just one example of Defendants' purported investment in student safety and well-being. (ECF 30 at 11-12 (¶¶ 29-30); ECF 30-1 at 96)). The I Care program entails a "School Clinician who has specific training in the assessment of substance use." (ECF 30-1 at 96). Not only does The Hill School owe duties in tort to its students, it owes a duty to care for the emotional well-being of students in the I Care program.

Finally, Doe has also alleged that Defendants' conduct in removing him from a treatment program and a support network that he needed to restore his health had a devastating mental impact including worsening depression and anxiety—which has required medical and psychological treatment, therapy, and counseling. (*Id.* at 9 (¶ 16), 28 (¶ 83), 34 (¶ 110), 35 (¶ 119), 36 (¶¶ 120, 121)).

In sum, Doe has alleged a relationship with an institution that accepted a duty to care for students' emotional wellbeing, as well as a breach of that duty, which inflicted deep emotional and psychological harm on Doe.

Defendants argue, however, that the NIED framework approved in *Toney* does not apply to the relationship between a student and a private secondary school. Citing a single case from the Western District of Pennsylvania, Defendants argue that "[c]ourts have expressly refused to include the student-private school relationship under the 'contractual or fiduciary' category" of NIED claims." (ECF 33-1 at 25). That case, *MDB v. Punxatawney Christian School*, concluded that "*absent special circumstances not present here*, the Pennsylvania courts would not extend liability for the NIED tort to a case involving a relationship between a school and its student." 386 F. Supp. 3d 565, 594 (W.D. Pa. 2019) (emphasis added). The *MDB* case involved a student who had been assaulted by another student while riding in a school-provided van and then withdrew from the school when administrators failed to provide requested protective accommodations. *See id.* at 573-575. *MDB* found that the relationship between the school and the student "was simply not of the intensely emotionally charged sort where courts have recognized a 'special relationship' giving rise to a duty not to negligently inflict emotional distress." *Id.* at 594.

*MDB* is distinguishable from this case. There is no sign that the school in *MDB* had the same deep focus on student well-being that The Hill School promised—let alone a substance use rehabilitation program—as recounted above. While the circumstances alleged in *MDB* were serious, that case did not involve a student with mental health and addiction challenges who was abruptly severed from a school-provided drug rehabilitation program that he urgently needed and was urged to avail himself of. Indeed, the relationship between Doe and The Hill School is

unusual because the School was not merely educating him, but providing medical care. Defendants did not merely expel a student from their school; they threw a student with mental health and substance use issues out of a substance use rehabilitation program that they claimed he needed. The "special circumstances" absent from *MDB* exist here.

A year after the *MDB* case, this Court addressed whether the "special circumstances" found absent from *MDB* might be present in another student-school relationship. *See Henry v. Sch. Dist. of Philadelphia*, No. 19-1115, 2020 WL 6287492, at *1 (E.D. Pa. Oct. 27, 2020). In *Henry*, Judge Baylson found that these "special circumstances" could exist because the student suffered from disabilities. *See id.* at *8. Thus, *MDB* certainly does not foreclose a private school's liability for negligent infliction of emotional distress, and it would be improper to dismiss Doe's claim at the pleading stage without a fully developed factual record.

Finally, it is necessary to respond to Defendants' footnote (ECF 33-1 at 20) asserting that "under Pennsylvania law, the relationship between student and school is 'purely contractual.'" For this proposition, Defendants quote dicta from a non-precedential case involving the relationship between a doctoral student and a private university. (ECF 33-1 at 20) (citing *Mekuns v. Capella Educ. Co.*, No. 15-1542, 2015 WL 7075825 (E.D. Pa. Nov. 13, 2015)). Defendants are wrong. The relationship between a student and a private boarding school is not a tort-free zone. For example: In *Dobson*, the Middle District of Pennsylvania rejected the argument that the "gist of the action" doctrine barred tort claims against the Milton Hershey School, a private secondary school where the plaintiff was a boarding student supervised by "houseparents," and where the school "exercised year-round custody, care and control over him and functioned as primary caregiver—providing education, housing, food, clothing, and medical, dental, and psychological care." 356 F. Supp. 3d at 432, 437. Of course, The Hill School is very similar, as

discussed above. Even *MDB* recognized that a private school "may owe legal duties, defined by tort law, to their students." 386 F. Supp. 3d at 591.

Accordingly, Doe has pleaded a claim for negligent infliction of emotional distress.

## VII. Doe plausibly pleads a claim for discrimination under the ADA.

Doe suffers from drug addiction, and The Hill School, on account of his qualified disability, discriminated against him by expelling him on the basis of that disability. This is sufficient to state a claim for disparate treatment under Title III of the Americans with Disabilities Act (the "ADA").[6]

As a threshold matter, this is a claim of *discrimination* (i.e., disparate treatment), not a *failure to accommodate* claim. Defendants rely on law addressing the latter. (ECF 33-1 at 31.) But the two frameworks are distinct, and addressing Doe's claim under an accommodation framework is inapposite. *Schomer v. Westmoreland Cnty.*, No. 20-790, 2022 WL 17905267, at *12 (W.D. Pa. Nov. 17, 2022) ("Disability discrimination under the ADA encompasses two kinds of claims: disparate treatment and failure to accommodate. These are distinct claims and a different analysis applies to each.").[7]

---

[6] Doe has standing under Title III of the ADA because Doe has demonstrated a "real and immediate threat" of injury and seeks injunctive relief to protect himself from that injury as well as to deter Defendants from visiting the same harm on others. *Harty v. Burlington Coat Factory of Pennsylvania, L.L.C.*, No. 11-1923, 2011 WL 2415169, at *3 (E.D. Pa. June 16, 2011). Doe has been prevented from attending The Hill School. (ECF No.ECF 30 at 2 (¶ 4)). Due to Doe's expulsion, his permanent record is and will continue to be affected. Every time Doe applies to future schooling, be it high school, college, or even professional school, Doe will have to report the expulsion. This represents a continuing harm stemming from Defendants' discrimination. A judgment would deter Defendants from repeating their discriminatory behavior against others.

[7] Defendants claim that "a school is 'not required to compromise the integrity of the school's policies, values and/or academic requirements in order to accommodate a student's disability.'" (ECF 33-1 at 31 citing *DMP v. Fay Sch. Ex rel. Bd. of Trustees*, 933 F. Supp. 2d 214, 222 (D. Mass. 2013)). Defendants' argument is premised on a failure to accommodate claim. Defendants attempt to recast Plaintiff's claim to read that the School had an obligation to *overlook* conduct to accommodate his disability—but this is *not* what Plaintiff alleges. Plaintiff alleges that he received disparate treatment *motivated by and based on*, in part, his disability (i.e., he was punished *more severely* in comparison to others due to his disability). (ECF 30 at 29 (¶ 88)). *DMP* is inapposite to the facts here. *Cf. Schomer*, 2022 WL 17905267, at *12.

Title III of the ADA prohibits discrimination by entities that provide public accommodations against an individual on account of his disability. *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 128 (2005). To state a claim, the plaintiff must establish, *inter alia*, that (1) he is disabled, (2) was discriminated against due to his disability, and (3) that discrimination resulted in a denial of services. *Sharrow v. Bailey*, 910 F. Supp. 187, 191 (M.D. Pa. 1995). Further, the discriminating entity must be a place of public accommodation.[8] *Id.* Doe has plausibly pled such a disparate treatment claim.

**A.    Qualified Disability**

Doe is disabled under the ADA because he has an impairment—drug addiction—that substantially limits a major life activity. Likewise, Defendants regarded Doe as having a drug addiction—which, alone, qualifies Doe for protection under the ADA. In order to be considered disabled under the ADA, the plaintiff must have "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; *or* (C) be[] regarded as having such an impairment." *See* 42 U.S.C. § 12102(1) (emphasis added). All three are independent avenues to establish a qualified disability. *See id.* Notably, the definition of "disability…shall be construed in favor of broad coverage of individuals under this chapter." 42 U.S.C. § 12102(4)(A). Determining disability "is a highly fact-intensive inquiry." *Herman v. Kvaerner of Philadelphia Shipyard, Inc.*, 461 F. Supp. 2d 332, 335 (E.D. Pa. 2006).

To establish an actual disability, a plaintiff must allege that he has "[i] physical or mental impairment that [ii] substantially limits one or more major life activities." 42 U.S.C. §

---

[8] Defendants admit that The Hill School is a qualifying entity that provides public accommodations under Title III. (ECF 33-1 at 26).

12102(1)(A). A "drug addiction" qualifies as a physical or mental impairment under the act. *See* 28 C.F.R. § 36.105(b)(1). Major life activities include but are not limited to "learning, reading, concentrating, thinking, writing, communicating, [and] interacting with others." 28 C.F.R. § 36.105(c)(1). An impairment that goes into remission due to treatment remains a protected impairment under the ADA. *See* 42 U.S.C. § 12102(4)(D) ("An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."); *see also Godwin v. George Washington, LP*, No. 22-1066, 2022 WL 18027827, at *2 (W.D. Pa. Dec. 30, 2022) (citing *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 339 (6th Cir. 2002)) (drug addiction remained qualified disability during treatment).

Doe has alleged a drug addiction and facts to support it. (ECF 30 at 3 (¶ 8) ("substance abuse problem"), 4 (¶ 10) ("The School's addiction specialist…determined that Doe needed significant medical intervention to address his substance dependency"), 15 (¶ 39) (met with "the School's primary addiction counselor")). Further, Defendants readily admit that Doe has "alleged dependency." (ECF 33-1 at 28). If Doe has "alleged dependency," then Doe has alleged a cognizable impairment. *See, e.g.*, *Godwin*, 2022 WL 18027827, at *2 (holding that the ADA protects "those who are recovering from drug addiction").

Doe has alleged that his drug addiction substantially limited major life activities, including learning, thinking, communicating, and interacting with others. For example, "Doe's substance use had significant adverse impacts upon…his academic performance." (ECF 30 at 11 (¶ 28)). After beginning recovery, Doe "experienced marked improvement in his…academic performance." (*Id.* at 19 (¶ 50)). Ms. Roethling, Director of the I Care Program, noted that, in recovery, Doe was "verbaliz[ing] clearer thinking [and showing] more engagement/connection with others," including by being "engaged, raising his hand, and commenting on others points."

(*Id.*). Doe has alleged that his substance use limited his ability to learn, communicate, and engage with others. Doe, without extensive intervention, was substantially limited by his impairment in the above major life activities—all of which are specifically enumerated by federal regulations. *See* 28 C.F.R. § 36.105(c)(1).

Defendants assert that "Doe's allegations indicate a high degree of major life activity functionality." (ECF 33-1 at 29). Defendants appear to argue that Plaintiff's marked improvement over the course of treatment, as well as Plaintiff's aspirations for his future given his previously-established athletic and academic aptitudes, curtail his impairment. This is incorrect under the law. Individuals who suffer from substance abuse are permitted to improve their lives through treatment and still benefit from the protections of the ADA. *See* 42 U.S.C. § 12102(4)(D) ("An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."); *see also Godwin, LP*, 2022 WL 18027827, at *2 (citing *MX Grp.*, 293 F.3d at 339 ("The statute itself belies any such contention.")). Plausibly alleging addiction is sufficient here—recovery through treatment, as a matter of law, does not negate the existence of a qualifying disability.

Defendants offer a misguided read of *RHJ Medical Center, Inc. v. City of DuBois*, interpreting it to stand for some form of a duration or severity requirement on drug addictions under the ADA. (ECF 33-1 at 28). But *RHJ* stands for nothing of the sort. *RHJ* stands for the unremarkable proposition that *one year of addiction* is—without further inquiry—sufficient to plead a drug addiction disability. *See id.* at 759-60.[9] *RHJ* says nothing as to a minimum amount

---

[9] The *RHJ* Court held that, since the plaintiffs were admitted into "a federally regulated methadone clinic" (which requires a patient to have "suffer[ed] from an opioid addiction for at least one year"), it is reasonable to conclude that such a patient had a qualified disability under the ADA. *RHJ*, 754 F. Supp. 2d at 759-60.

of time, nor does it establish a required "severity." *Compare id. with* ECF 33-1 at 28. Defendants cannot misuse *RHJ* to change the pleading requirements for a disparate treatment ADA claim.[10]

Here, Doe has pled plausible factual allegations to establish that he has an impairment (drug addiction) that substantially limits multiple major life activities (e.g., learning). This is sufficient to establish that Doe has a qualified disability.

Finally, Doe has alleged that Defendants *regarded* him as suffering from drug addiction. (ECF 30 at 4 (¶ 10) ("The School's addiction specialist…determined that Doe needed significant medical intervention to address his substance dependency"), 15 (¶ 39) (Doe met with "the School's primary addiction counselor")). Doe has alleged that the School had knowledge of his disability and believed it to require "significant medical intervention." (*Id.*). This is an independent basis to establish that Doe has a qualified disability under the ADA. *See* 42 U.S.C. § 12102(1)(C); *see also Rubano v. Farrell Area Sch. Dist.*, 991 F. Supp. 2d 678, 693 (W.D. Pa. 2014) (holding that knowledge of an impairment, alone, is sufficient to create an issue of fact for the factfinder as to whether a plaintiff was "regarded as" disabled). Defendants fail to assert *any* defense to this independent avenue of ADA protection—which does not require proof of actual impairment or a substantially limited major life activity. *See Rubano*, 991 F. Supp. 2d at 693.

Doe has pled a qualified disability—both that he was actually disabled and that he was regarded as such. *See* 42 U.S.C. § 12102(1). Either is sufficient for his claim to survive. Any debate into the breadth, depth, or persistence of Doe's impairment is a question of fact and

---

[10] Likewise, Defendants misapply *Bowers v. National Collegiate Athletic Association*, 563 F. Supp. 2d 508, 532 (D.N.J. 2008). *Bowers* holds that "[a]n *in limine* motion is not a proper vehicle for a party to ask the Court to weigh the sufficiency of the evidence….Accordingly, to the extent that Plaintiff's motion asks the Court to find, as a matter of law, that Bowers had a record of having a disability…the motion [*in limine*] will be denied." *Id.* at 532. In fact, *Bowers* notes that "the determination of whether someone is disabled is a highly fact-intensive inquiry" and ordinarily "involves a determination of state of mind that is more appropriate for the jury than for the judge." *Id.* at 532 n.18.

should not be resolved on a motion to dismiss. *Cf. Kevin C. v. Foundations Behavioral Health*, No. 20-6431, 2021 WL 3737206, at *3 n.4, *appeal dismissed*, No. 21-2771, 2023 WL 3244575 (3d Cir. May 4, 2023); *Herman*, 461 F. Supp. at 335 (determining disability "is a highly fact-intensive inquiry."). It is enough that Doe has pled facts rendering plausible a qualifying impairment which substantially limits his major life activities.

### B.    Discriminated Against On the Basis of Disability

Doe alleged that he was discriminated against by Defendants' reliance on his drug addiction as a basis for expulsion. (ECF 30 at 5-6 (¶ 12), 17 (¶ 45), 19 (¶ 50), 27 (¶ 80), 28 (¶ 82), 29 (¶ 88)). The ADA prohibits "discrimination on the basis of disability, even if there is another cause as well." *See CG v. Pennsylvania Dep't of Educ.*, 734 F.3d 229, 235-36 (3d Cir. 2013) ("The existence of an alternative cause, however, may not necessarily be fatal to an ADA claim so long as disability 'played a role in the…decisionmaking process and…had a determinative effect on the outcome of that process.'") (quoting *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 300 n.4 (3d Cir. 2007))). A plaintiff must allege that his "disability played a role in" and "had a determinative effect on the outcome of that process." *Id.*

Here, Plaintiff alleges that Defendants relied on his disability in reaching their decision to expel him. Plaintiff pled facts supporting this allegation: (1) Defendants relied on "information about Doe's substance use and related behavior to reach a conclusion that Doe should be expelled" (ECF 30 at 7(¶ 13)); (2) the School "authored a decision letter explaining Doe's expulsion that unambiguously and unabashedly relied upon Doe's substance use history to justify his expulsion," (*id.*); (3) "Upon information and belief, Dean Baum made improper disclosures to the Discipline Committee about Doe's substance use during deliberations," (*id.* at 27 (¶ 78)); (4) "The decision letter made clear—in plain and explicit terms—that Doe's substance use was a

motivating factor in the School's decision," (*id.* at 27 (¶ 80)); and (5) the School's expulsion letter emphasized that his expulsion was due to, at least in part, "the extensiveness of his substance possession, usage, and distribution on campus over several months [which] demonstrated extraordinary risk taking," (*id.* at 28 (¶ 82)). Defendants made the basis of their decision clear—and this is buttressed by the disparate treatment Doe faced.

The other students who were expelled had been warned not to bully, generally, and specifically, not to bully the particular student-victim. (*Id*. at 22 (¶ 59)). Doe had not previously been disciplined for bullying, nor did Doe have any past record of bullying the student-victim. (*Id.* at 22 (¶¶ 59-60)). Despite this significant difference in Doe's conduct and history, in comparison to the other expelled students, the Committee chose to expel Doe. It is no great mystery why. The Committee stated their reasons in Doe's expulsion letter, including: "the extensiveness of [Doe's] substance possession, usage, and distribution on campus[,]…the totality of his decision making caused his position to be untenable." (*Id.* at 28 (¶ 82)). Defendants' own rule commanded that they ignore Doe's pre-I Care "substance possession, usage, and distribution." (*Id.* at 16 (¶ 43)). Defendants complied with their own rule for others, but not for Doe.

These factual allegations render it more than plausible that the School expelled Doe, at least in part, "on the basis of disability" (i.e., Doe's disability "played a role in" and "had a determinative effect on" his expulsion). *See CG*, 734 F.3d at 235-36. And that is sufficient to establish prong two for a discrimination claim under the ADA at the pleading stage.

Defendants offer in defense that Plaintiff was "required to withdraw because he bullied another student." (ECF 33-1 at 30). But this falls flat. Plaintiff does not need to allege that discrimination on account of his disability was the *sole* reason for his dismissal, only that a

discriminatory intent was a motivating factor. *See CG*, 734 F.3d at 235-36. As explained above, Plaintiff has plausibly alleged that Defendants were motivated, at least in part, by his disability. Any further debate into the nature, extent, or effect of Defendants' impermissible motive is a question of fact not to be reached on a motion to dismiss.

C.      **Denial of Services**

Doe has alleged that Defendants used Doe's disability as a basis for his dismissal. "The denial of equal treatment by virtue of plaintiff's disability violates the ADA." *Sharrow*, 910 F. Supp. at 192 (citing *D.B. v. Bloom*, 896 F. Supp. 166, 169-70 (D.N.J. 1995)). Discrimination on the basis of disability does not have to be the *sole* cause to be prohibited conduct. *See CG*, 734 F.3d at 235-36 (holding the ADA prohibits "discrimination on the basis of disability, even if there is another cause as well"). Defendants' discriminatory reliance on Doe's disability in his expulsion was a cause of Doe's expulsion, i.e., the denial of services to Doe by an entity that provides public accommodations. This is sufficient to state a disparate treatment claim of denial of services on the basis of discrimination under the ADA.

Expelling Doe is the quintessential denial of services, as it permanently disallows him from accessing the services of the School. *Cf. Sharrow*, 910 F. Supp. at 192.

Defendants' placement of Doe on permanent probation caused his expulsion. But for Defendants' discriminatory decision to place Doe on permanent probation, Doe would not have been expelled. (ECF 30 at 29 (¶¶ 87-88)). Doe has alleged that: (1) of the students involved in the alleged bullying, only the students with prior discipline records were required to withdraw (*id.* at 23 (¶ 64), 29 (¶ 88)); and (2) of all of the students who had ever been disciplined for similar conduct, no one had been expelled prior to this incident. *No one* was expelled for having "bullied another student" (ECF 33-1 at 30)—at any point—*without* having a prior disciplinary

record, such as being on permanent probation. Therefore, if Doe had not been placed on permanent probation, he would not have been expelled. Doe was denied "equal treatment by virtue of [his] disability" when he was expelled. *See Sharrow*, 910 F. Supp. at 192.

That disparate treatment on account of Doe's disability is prohibited under the ADA. Denying Doe services on account of his disability—even if it is only one of several factors—is impermissible under the ADA. *See CG*, 734 F.3d at 235-36. Thus, Doe has sufficiently stated a claim for disparate treatment under the ADA.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss the Amended Complaint.

Respectfully,

*/s/ Patricia M. Hamill*
Patricia M. Hamill (PA Id. No. 48416)
Andrew S. Gallinaro (PA Id. No. 201326)
**CLARK HILL PLC**
Two Commerce Square
2001 Market Street, Suite 2620
Philadelphia, PA 19103
(t) (215) 640-8500/(f) (215) 640-8501
phamill@clarkhill.com
agallinaro@clarkhill.com

*Attorneys for Plaintiff John Doe*

Date: July 21, 2023

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above document was filed on July 21, 2023 via the Court's electronic case filing system (ECF) and is available for downloading and viewing by all counsel of record.


_/s/ Patricia M. Hamill_