**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| **JOHN DOE,** | | : | |
| | **Plaintiff,** | : | |
| | | : | |
| | **v.** | : | **CIVIL ACTION** |
| | | : | **No. 23-1210** |
| **THE HILL SCHOOL and** | | : | |
| **ARIEL BAUM,** | | : | |
| | **Defendants.** | : | |

**McHUGH, J.**                                                                                      **August 18, 2023**

<u>**MEMORANDUM**</u>

        This is an action brought by John Doe,[1] a former student of the Hill School, who contends
that the school improperly based its decision to require him to withdraw from the school on his
prior drug use, despite promising him that he would be protected from sanction from his past usage
and related conduct.  The Plaintiff advances claims against the Hill School for breach of contract,
promissory estoppel, violation of the Americans with Disabilities Act (ADA), and negligent
infliction of emotional distress (NIED).  He also advances a claim against both the Hill School and
its Dean of Students, Ariel Baum, for intentional infliction of emotional distress (IIED).  Doe
alleges plausible breach of contract and ADA claims, but the facts alleged do not suffice to
establish plausible claims for promissory estoppel, NIED, or IIED, and those claims will therefore
be dismissed.

---

[1] I previously granted Doe's motion to proceed under a pseudonym.  ECF 3.

## I.   FACTUAL ALLEGATIONS

### A.  Doe's Enrollment in the Hill School and the "I Care" Program

Plaintiff John Doe is an 18-year-old high school student.  Am. Compl. at ¶ 18, ECF 30. Doe has both attention deficit disorder and major depressive disorder.  *Id.* at ¶ 25.  These conditions were exacerbated by the hybrid learning environment that came with the COVID-19 pandemic. *Id.*  Doe and his parents decided to enroll him in the Hill School in fall 2022 because the school could provide more individualized attention and greater learning resources than his previous school.  *Id.* at ¶¶ 24-25.  He enrolled as a boarding student entering his junior year.  *Id.* at ¶ 24.  At the time of his enrollment, he did not have any disciplinary history.  *Id.* at ¶ 25.

Unbeknownst to Doe and his parents, the Hill School was battling a wide-spread drug problem at the time of Doe's enrollment.  *Id.* at ¶ 27.  Soon after entering the Hill School, Doe began using marijuana and tobacco to manage his depression and anxiety and to better fit in with his peers.  *Id*.  This substance use significantly and detrimentally impacted his mental health, emotional well-being, and academic performance.  *Id.* at ¶ 28.

The Hill School maintains a program called "I Care," short for "Immediate Care Program," that is managed by Dean of Students Ariel Baum.  *Id.* at ¶ 29.  The program is meant to provide a wellness- and safety-focused alternative to traditional discipline for students who have used disallowed substances.  *Id.* at ¶ 30.  Doe alleges that the program promises that students will not be disciplined for their substance use or their participation in I Care if they comply with the program, including by participating in an initial assessment, allowing the school to search the student's room and phone, promising to refrain from future substance use, agreeing to submit to random drug testing, and participating in one-on-one and group counseling.  *Id.* at ¶ 31.

The Hill School first discovered Doe's substance use in early December 2022.  *Id.* at ¶ 32. The school determined that his condition was severe enough to justify sending Doe home for the

final week of the Fall Term to begin recovering with family.  *Id.*  Prior to doing so, however, the school enrolled him in I Care.  *Id.* at ¶ 33.  Doe signed an I Care contract that explained that his I Care participation could be held against him in disciplinary proceedings if he 1) tested positive for any disallowed substance, 2) engaged in another action that would implicate the I Care program, or 3) otherwise violated the school's substance use policy.  *Id.*  The school explained that the program was otherwise non-disciplinary and that his prior conduct related to substance use would not subject him to disciplinary consequences.  *Id.*  Doe complied with all program requirements after enrolling, leading Baum to make note of Doe's progress in January 2023.  *Id.*

As part of his I Care compliance, Doe provided Baum and the Associate Dean of Students, Heidi Eccleston, with access to his cell phone.  *Id.* at ¶ 34.  Baum and Eccleston took interest in text messages between Doe and a friend from before Doe's enrollment in I Care, which revealed that Doe's friend had requested Doe to bring him a detoxifying drink that would help his friend pass a drug test that would otherwise have revealed marijuana usage.  *Id.* at ¶¶ 34-35.  The texts showed that Doe complied with his friend's request.  *Id.*  Doe alleges that he was under the influence of marijuana at the time of doing so, which impacted his decision-making.  *Id.*  Baum and Eccleston directed Doe to send them screenshots of the text messages and then deleted the original messages from Doe's phone.  *Id.*  Doe alleges that they did so in order to maintain leverage over him by allowing the school to have exclusive access to incriminating information.  *Id.*

Around the same time, the Hill School conducted a search of Doe's room, in which Doe fully cooperated.  *Id.* at ¶ 36.  The search revealed information that Baum—allegedly incorrectly— believed to indicate that Doe had been distributing substances on campus.  *Id.*  Doe alleges that he and his friends never sold substances at the Hill School, but merely helped one another obtained THC and nicotine cartridges, shared such cartridges within their peer group, and reimbursed each

other when one of them had purchased cartridges for the group. *Id.* at ¶ 37. Doe alleges that, throughout this time, Baum took advantage of the I Care requirement that students permit searches of their personal items and space, and that Baum conducted such searches with the true intent of punishing students who Baum believed to be contributing to the school's drug problem. *Id.* at ¶ 38.

After speaking with and testing Doe during his enrollment into I Care, the school's primary addiction counselor became concerned about Doe's health and safety. *Id.* at ¶ 39. The counselor presented two options to Doe's mother during an in-person meeting. *Id.* Doe could either take a Medical Withdrawal from the Hill School for 6-12 weeks to seek in-patient recovery treatment, which would require Doe to miss his second semester at the school, or Doe could remain substance-free through Winter Break and participate in the I Care program while continuing his education in January. *Id.* Doe's parents decided on the second option because of their belief in the strength of the Hill School's I Care Program, their belief that the I Care program would grant amnesty from discipline for Doe's past usage, and their belief that the school was the healthiest social environment for Doe. *Id.* at ¶ 40. Doe returned home over Winter Break and returned to the Hill School at the start of the Winter Term in early January to begin treatment in the I Care program. *Id.* at ¶ 41.

Doe alleges that, throughout this time, Mr. Baum "was scheming a way to discipline Doe for his involvement in the school's drug culture" and developed a "personal vendetta" against Doe. *Id.* at ¶ 42. In email communications between Baum and the interim Head of School Dr. Rodriguez Vargas over the Winter Break, Baum expressed a desire to discipline Doe, despite allegedly recognizing that doing so would violate the school's rules. *Id.* at ¶ 43. In this email, Baum admitted that "I Care protects everything, including substance usage, distribution, and even other

rules broken related to that usage." *Id.*  Baum told Dr. Vargas that he did not recommend that the Hill School expel Doe because "one could argue that everything is protected by I Care" and that such discipline would therefore be "risky." *Id.*

Baum wrote to Doe's parents a week after Doe returned for the Winter Term. *Id.* at ¶¶ 44-46.  In that letter, Baum explained that the school was imposing retroactive discipline on Doe based on information it acquired through Doe's enrollment in I Care.  *Id.*  The school retroactively suspended Doe for the week he spent away from school at the start of his recovery and placed Doe on permanent "Conduct Warning"—defined as a probationary period during which disciplinary infractions will result in an increased chance of dismissal from the Hill School.  *Id.*

Doe and his parents neither challenged the sanction nor understood its severity, in part because they had been told that I Care was non-punitive. *Id.* at ¶¶ 48-49.  Doe continued to comply with all I Care requirements and thrived during this time, experiencing improvements to his mental health, academic performance, and relationships with his peers and teachers.  *Id.* at ¶ 50.

### B.  Doe's Subsequent Conduct and Disciplinary Sanction

Doe alleges that the Hill School has a prevalent culture of dormitory pranking, and that the Student Handbook condones certain types of pranks, going so far as noting that "Sixth form [senior] pranks are a hallowed tradition and acceptable if they are carried out in a positive manner." *Id.* at ¶ 51.  Doe was pranked in February 2023, when other students engaged in what is colloquially known as "watering," which consists of students sneaking into the room of a sleeping peer and throwing water on them.  *Id.* at ¶ 53.  The Hill School classifies such a prank as a "Level III" offense, the most serious category of offense and one that can give rise to the perpetrators being required to withdraw, but Doe alleges that the Hill School had not previously treated the prank in such a serious manner.  *Id.* at ¶ 55 n.2.  Doe considered the prank to be harmless and did not report it to the Hill School.  *Id.* at ¶ 53.

Due to the prevalence of similar pranks, the Dorm Parents assigned to Doe's dormitory called a dorm-wide meeting in early February 2023, in which the Dorm Parents told students to stop "watering" their classmates but did not inform students what discipline would accompany any future "watering" incidents. *Id.* at ¶ 54. Doe was aware that—prior to this meeting—students who had been caught in such pranks received detention or the equivalent, but was not aware of students receiving more significant discipline. *Id.* at ¶ 55.

Doe received a text message from a friend the following weekend, inviting him to a late-night gathering in a friend's room in which four upperclassmen were deciding which student they would "water" that night. *Id.* at ¶¶ 56-57. Doe felt pressure to join in on the prank. *Id.* The group designated Doe—the least senior member of the group by class year—to throw the water while the others watched or recorded the incident. *Id.* at ¶ 58. One of the classmates handed Doe a cup of protein powder and instructed him to throw it along with the water. *Id.* Doe did so, and the group fled the room. *Id.*

Doe considered the classmate who he threw water on to be a friend and did not know that the classmate had experienced bullying from other dormmates, including some of the four who had encouraged Doe to throw the water. *Id.* at ¶ 59. The student had previously complained to the school, and the student's Dorm Parents had called a meeting telling students living on his floor to leave him alone. *Id.* Doe alleges that he had not received that warning and was not aware of the student's history of being bullied. *Id.*

The next morning, Doe's Dorm Parents called a meeting of the entire dormitory and gave students several minutes to admit to carrying out the prior night's incident, stating that students who failed to identify themselves would receive severe discipline. *Id.* at ¶ 61. The Dorm Parents in fact knew who had committed the prank because the student who was bullied had identified the

perpetrators prior to the meeting.  *Id.* at ¶ 62.  Doe alleges that he was frightened and confused and therefore did not step forward.  *Id.*  Doe and the four classmates were then separated and instructed to write statements about the prior night's incident.  *Id.* at ¶ 63.  Doe confessed his role in his written statement and was thereafter informed that he was suspended.  *Id.*

The Hill School informed Doe that it would conduct a disciplinary hearing process overseen by Ariel Baum.  *Id.* at ¶ 64.  Doe alleges that no other students who have engaged in "watering" have been subject to a formal disciplinary hearing or expulsion before or since; that Baum had already determined that Doe would be expelled; that the hearing was a "sham" designed to give the illusion of fair process; that Baum recommended that Doe be required to withdraw from the Hill School in a closed-door meeting; and that Baum prohibited Doe's I Care Counselor from advocating on Doe's behalf at the Discipline Committee hearing.  *Id.* at ¶¶ 64-66, 71-72, 77.  Baum held two meetings with Doe to discuss the Discipline Committee process.  *Id.* at ¶¶ 68-69.  In those meetings, Baum told Doe that I Care was not relevant to the proceedings and that Doe should limit any discussion of how he came to be placed on Conduct Warning, stating only that he had been "dishonest."  *Id.*

The hearing took place in mid-February.  *Id.* at ¶ 73.  Mr. Baum and Ms. Eccleston both took active roles in the process, despite Baum technically sitting as a non-voting chair and moderator.  *Id.*  Baum informed the Committee that Doe's conduct warning arose from Doe's "interfering with a medical investigation."[2]  *Id.*  Doe alleges that Baum read out a statement of what Baum claimed were undisputed facts, in which Baum made improper mention of Doe's prior actions that were covered by I Care, including providing an exaggerated account of Doe's past

---

[2] Doe alleges that Baum's statement was false, and that Baum had previously acknowledged that Doe's conduct in providing a detoxifying drink to his friend had not impacted the Hill School's medical investigation.  *Id.*

substance use and related conduct.  *Id.* at ¶¶ 74-75, 78.  By unanimous vote, the Committee found

Doe responsible for "Bullying" and "Disrespectful Behavior" and recommended to Dr. Vargas

that Doe be required to withdraw from the Hill School.  *Id.* at ¶ 79.

 Mr. Baum sent a letter to Doe's parents soon after, in which Baum explained the basis for

the Hill School's decision to require him to withdraw.  *Id.* at ¶ 80.  Doe provides the following

excerpt from the letter, which Doe alleges demonstrates that the decision was based on Doe's past

substance use:

> [Doe's] placement on Conduct Warning was outlined in detail in a January 10 email
> that I sent to your family. I also met with [Doe] around this time to express with
> candor how precarious his position at The Hill School would be if he were involved
> in any future school violations. It should also be noted that the January 10 email
> summary also included detail around [Doe] being placed on I Care in December.
> *Even though I Care is non-disciplinary, what we learned during that process is that
> the extensiveness of his substance possession, usage, and distribution on campus
> over several months demonstrated extraordinary risk taking. ... the totality of his
> decision making caused his position to be untenable, especially the proximity
> between his suspension and placement on Conduct Warning, and these most recent
> infractions.*

*Id.* at ¶ 82 (emphasis added in Doe's Amended Complaint).  Doe's parents attempted to meet with

Dr. Vargas in person after receiving this letter, but no administrator was willing to meet with them

to address their concerns about the impact of Doe's withdrawal on his mental health and recovery.

*Id.* at ¶ 85.  Doe alleges that Dr. Vargas was generally uninvolved in the disciplinary process,

deferring entirely to Mr. Baum.  *Id.* at ¶ 81.

 Doe alleges that, of the four other students who participated in the "watering" incident,

only the other two students who had prior disciplinary infractions were required to withdraw,

which Doe alleges demonstrates that his own prior disciplinary history was the deciding factor in

the Hill School's disciplinary decision.  *Id.* at ¶ 87.  Doe further alleges that no other students have

been required to withdraw following similar conduct.  *Id.* at ¶ 88.

## II.   STANDARD OF REVIEW

In this Circuit, motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

## III.   DISCUSSION

### A.  Doe's Americans with Disabilities Act and Breach of Contract Claims

Doe alleges that the Hill School based its disciplinary action on his prior substance use, violating both the ADA and its contract with Doe based on his enrollment in I Care. The Hill School moves to dismiss these causes of action, but because Doe has pleaded facts suggesting that his ADA and contract claims are at least plausible, dismissal is not appropriate at this time.[3]

Regarding Doe's ADA claim, the Hill School argues that Doe's substance dependency was not severe enough to constitute a disability under the ADA; that Doe has failed to allege that his substance dependency impacted a major life activity; that Doe's dependency is not "verifiable to a high degree of certainty"; that Doe was required to withdraw for reasons independent of his substance use; and that any disability under the ADA would not invalidate the school's discipline for unrelated offenses.  One or more of these arguments may well ultimately defeat Doe's ADA claim.  But Doe has pled facts suggesting that his substance use was severe and impactful on specific major life activities; that the school regarded him has suffering from a drug addiction; and that his substance use was one of the bases of the school's decision to require his withdrawal.  No more is required at this stage in the litigation.

---

[3] I previously denied Doe's request for a preliminary injunction.  In doing so, I considered evidence that weighed strongly in favor of the Hill School.  ECF 22.  But on a motion to dismiss, I must take the facts alleged in a complaint as true.

Turning to Doe's breach of contract claim, Doe presents a plausible theory that, because of his participation in the I Care program, his contractual relationship with the Hill School protected him from discipline pertaining to his distribution of drug paraphernalia, and that the school based its decision to require Doe to withdraw in part on contractually-protected activity. The Hill School disputes this characterization on multiple fronts, arguing that enrollment in I Care did not limit the Head of School's unfettered discretion to require a student to withdrawal; that Doe's distribution of a detoxifying agent did not fall within I Care's protections; and that the school's decision to require Doe's withdrawal was based solely on his bullying of another student, rather than his drug use or related activities. But I view these disagreements as factual disputes, and at this stage, Doe has pled sufficient facts to plausibly suggest that the Hill School breached its contractual obligations.

### B. Doe's Promissory Estoppel Claim

As an alternative to his breach of contract claim, Doe claims that the Hill School made several non-contractual promises that Doe relied on to his detriment, giving rise to promissory estoppel. The Hill School argues that this claim must be dismissed because promissory estoppel only applies in the absence of an enforceable contract. *See Carlson v. Arnot-Ogden Mem'l Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990). In response, Doe argues that courts permit litigants to plead promissory estoppel as an alternative to breach of contract claims, and that courts properly refrain from dismissing such claims until the court determines whether there was an enforceable contract. *See Olivia B. ex rel. Bijon B. v. Sankofa Acad. Charter Sch.*, No. CIV.A. 14-867, 2014 WL 7238390, at *6 (E.D. Pa. Dec. 19, 2014) (Kelly, J.). But that is only true in situations where there is a dispute as to whether the parties entered into an enforceable contract. *See Azer Sci. Inc. v. Quidel Corp.*, No. 5:21-CV-02972-JMG, 2021 WL 5918655, at *5 (E.D. Pa. Dec. 15, 2021) (Gallagher, J.); *Cardiology Care for Child. Inc. v. Ravi*, No. 5:17-CV-04743, 2018 WL 1870717,

at \*5 (E.D. Pa. Apr. 18, 2018) (Leeson, J.).  And there is "an abundance of case law" supporting the notion that dismissal of a promissory estoppel claim is appropriate when there is no dispute as to the existence of an enforceable contract.  *Cardiology Care for Child. Inc.*, 2018 WL 1870717, at \*5.

In his response to Defendants' Motion to Dismiss, Doe states that "Defendants' motion does not dispute that The Hill School's procedures form a contract." ECF 35 at 24.  Defendants have further admitted that they "agree there was a contract between Doe and Hill." ECF 37 at 4.  Because there is no dispute as to the existence of an enforceable contract between the parties, I will dismiss Doe's promissory estoppel claim.

### C. Doe's Intentional Infliction of Emotional Distress Claim

Plaintiff claims that the Hill School and Ariel Baum committed the tort of IIED because they imposed unwarranted punishments on Doe despite knowing that Doe suffered from anxiety, depression, and other psychological ailments.  This claim must be dismissed, because Defendants' alleged actions were neither extreme nor outrageous and therefore cannot give rise to IIED liability.

Pennsylvania law defines IIED as follows:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

*Shaner v. Synthes*, 204 F.3d 494, 507 (3d Cir. 2000) (quoting *Hoy v. Angelone*, 720 A.2d 745, 753 (Pa. 1998)).  In order to establish IIED liability, "[t]he conduct must be so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Jordan v. Pennsylvania State Univ.*, 276 A.3d 751, 775 (Pa. Super. Ct. 2022) (internal quotations omitted).  This is a very high bar:

> Conduct that Pennsylvania courts have deemed sufficiently outrageous to constitute IIED includes: (1) killing the plaintiff's son with an automobile and then burying the body, rather than reporting the incident to the police; (2) intentionally fabricating documents that led to the plaintiff's arrest for murder; and (3) knowingly releasing to the press false medical records diagnosing the plaintiff with a fatal disease.

*Dull v. W. Manchester Twp. Police Dep't*, 604 F. Supp. 2d 739, 756 (M.D. Pa. 2009) (citing *Hoy*, 720 A.2d at 754).[4]

Plaintiff correctly states that Pennsylvania follows the Restatement (Second) of Torts for IIED claims, and that the Restatement specifies that the "extreme and outrageous character of the conduct may arise from an abuse by the actor of a position . . . which gives him actual or apparent authority over the other, or power to affect his interests." Restatement (Second) of Torts Sec. 46, comment (e). The Restatement further notes that school authorities may be liable for IIED for "extreme abuse of their position." *Id.* But Plaintiff ignores the very next sentence in the Restatement: "Even in such cases, however, the actor has not been held liable for mere insults, indignities, or annoyances that are not extreme or outrageous." *Id.*[5]

The Restatement provides a single example of what a school administrator committing IIED might look like:

> A, the principal of a high school, summons B, a schoolgirl, to his office, and abruptly accuses her of immoral conduct with various men. A bullies B for an hour, and threatens her with prison and with public disgrace for herself and her parents

---

[4] I note that "it is for the court to determine, in the first instance, whether the actor's conduct can reasonably be regarded as so extreme and outrageous as to permit recovery." *Reimer v. Tien*, 514 A.2d 566, 569 (Pa. Super. Ct. 1986) (citing *Dawson v. Zayre Dept. Stores*, 499 A.2d 648 (Pa. Super. Ct. 1985); Restatement (Second) of Torts Sec. 46, comment (h) (1965)).

[5] Plaintiff also points to Restatement (Second) of Torts Sec. 46, comment (f), which states that "[t]he extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity." But here too, "major outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough." *Id.*

> unless she confesses.  B suffers severe emotional distress, and resulting illness.  A
> is subject to liability to B for both.

Restatement (Second) of Torts Sec. 46, comment (e).  The allegations here fall dramatically short of the controlling standard.

Doe's sole case citation to support the notion that Defendants' conduct was extreme or outrageous is *Doe v. Brown Univ.*, 43 F.4th 195, 210 (1st Cir. 2022), which quoted *Russell v. Salve Regina Coll.*, 649 F. Supp. 391, 402 (D.R.I. 1986), for the proposition that a student "stands in a particularly vulnerable relationship vis-à-vis the university, the administration, and the faculty." *Brown* further provides that a school can "'fairly be expected' to act 'maturely – and even with some tenderness and solicitude – toward' its students." *Id.*  But neither *Brown*, nor the district court case on which it relied, supports Plaintiff's IIED claim.

In allowing an IIED claim to proceed against a college, the *Russell* court explained that "[a]lthough a private college must be afforded wide discretion in enforcing its scholastic standards and in disciplining its students, there is no justification for debasement, harassment, or humiliation." *Russell*, 649 F. Supp. at 402.  *Russell* concerned a student whose supervisors routinely and severely harassed her for her weight.  *Id.* at 394-95.  And *Brown* concerned school administrators who ignored a doctor's advice and confronted a student with charges being brought against him and potential consequences the same day he was released from a hospital after an attempted suicide.  *Brown*, 43 F.4th at 202-204.  Both cases concerned actions far beyond typical discipline.

In contrast, the actions alleged in Doe's Complaint are the exact type of standard discipline that courts must afford schools wide discretion in enforcing.  None of the Hill School's or Baum's alleged actions cross the line into debasement, harassment, or humiliation. And while Doe may take issue with Defendants' alleged violation of their own disciplinary protocols, failure to follow

such protocols is neither extreme nor outrageous enough to give rise to IIED liability.  *Cf. Doe v. Abington Friends Sch.*, No. CV 22-0014, 2022 WL 16722322, at *6 (E.D. Pa. Nov. 4, 2022) (Pappert, J.) (dismissing an IIED claim pertaining to a school's alleged failure to follow its policies for investigating and resolving bullying complaints).  Plaintiff's IIED claim will therefore be dismissed.

### D.  Doe's Negligent Infliction of Emotional Distress Claim

Plaintiff also claims that the Hill School committed the tort of NIED when imposing discipline on Doe.  This claim likewise fails as a matter of law, because Pennsylvania law forecloses Doe's theory of NIED liability.

Plaintiff bases his NIED claim on a "special relationship" theory—recognized in *Toney v. Chester Cnty. Hosp.*, 961 A.2d 192, 198 (Pa. Super. Ct. 2008) (en banc), *aff'd*, 36 A.3d 83 (Pa. 2011)—that the Hill School owed an implied duty to care for Plaintiff's emotional well-being. The controlling question is whether Doe's relationship to the school gave rise to a special duty of care.[6]

*Toney* arose out of the somewhat unique relationship between obstetricians and an expectant mother.  Since a duty was recognized there, "courts have largely declined to expand this 'special relationship' theory of NIED outside the 'narrow grounds' of the medical context," "with a second narrow category existing between adoption agencies and adoptive parents."  *Henry v. Sch. Dist. of Phila.*, No. CV 19-1115, 2020 WL 6287492, at *8 (E.D. Pa. Oct. 27, 2020) (Baylson, J.) (compiling cases).

In *MDB v. Punxsutawney Christian School*, a district court in this Circuit considered whether, by "assum[ing] the responsibility and care for [plaintiff] during the school day," a private

---

[6] The Supreme Court in *Toney* was evenly divided, which left the six to two *en banc* opinion of the Superior Court the controlling standard under Pennsylvania law.

school had created "a special relationship where [the school] understood it was in charge of [the student's] emotional well-being."  386 F. Supp. 3d 565, 593 (W.D. Pa. 2019).  It held that "absent special circumstances . . . the Pennsylvania courts would not extend liability for the NIED tort to a case involving a relationship between a school and its student."  *Id*. at 594.  More recently, another court in this Circuit held that "[t]he contractual relationship between a private school and its student cannot support an NIED claim under Pennsylvania law."  *Abington Friends Sch.*, 2022 WL 16722322, at *6.[7]

Plaintiff attempts to rely on *Henry*, 2020 WL 6287492, at *8-9, to suggest that a special relationship could exist between a private school and a student when that student suffers from disabilities.  But *Henry* dismissed the NIED claim based on official immunity and "decline[d] to rule on whether Plaintiffs have pleaded a sufficient 'special relationship' to sustain an NIED claim under *Toney*."  *Id*. at *8.

Plaintiff has failed to point to any Pennsylvania or Third Circuit authority suggesting that a private school has a special relationship with a student that could give rise to NIED liability, and to my knowledge no such authority exists.[8]  And although Plaintiff suggests that boarding schools owe a greater duty, as a federal judge sitting in diversity it is not my place to dramatically expand liability under Pennsylvania law in the absence of any indication that the Pennsylvania courts would recognize such a duty.  I will therefore dismiss Plaintiff's NIED claim.

---

[7] Courts have made clear that such a special relationship also does not exist between a college and its students, because such a relationship does not hold the potential for deep emotional harm.  *See, e.g., Hershman v. Muhlenberg Coll.*, 17 F. Supp. 3d 454, 460 (E.D. Pa. 2014); *Humphries v. Pa. State Univ.*, No. 4:20-CV-00064, 2021 WL 4355352, at *22 (M.D. Pa. Sept. 24, 2021).

[8] *Giannone v. Ayne Institute*, 290 F. Supp. 2d 553, 569 (E.D. Pa. 2003), has no relevance here, as the student in that case pleaded bodily injury.  Pennsylvania has long recognized NIED claims accompanied by physical injury.  The issue in *Toney* was whether such claims could be advanced in the absence of physical injury.

**IV.      CONCLUSION**

For the reasons set forth above, Defendants' Motion to Dismiss will be granted in part and

denied in part.  An appropriate order follows.

  /s/ Gerald Austin McHugh
United States District Judge
